332 F.2d 541
 George GILMER, Creditor, Appellant and Cross-Appellee,
v.
B. B. WOODSON, Trustee in Bankruptcy, Appellee and Cross-Appellant.
In the Matters of Sterling R. DECKER, Bankrupt, In
Bankruptcy No. 706; andSterling R. Decker and Mary
Jane Decker, Partners, t/a Berkeley
CommunityBuilders, Bankrupts,
In Bankruptcy No. 707.
 No. 9107.
 United States Court of Appeals Fourth Circuit.
 Argued Nov. 8, 1963.
Decided May 25, 1964.
 
 Charles A. Via, Jr., Charlottesville, Va. (Richmond & Via, and Carl E. Hennrich, Charlottesville, Va., on brief), for appellant and cross-appellee.
 William S. Aaron, Jr., and Robert M. Musselman, Charlottesville, Va. (Walker, Woodson & Aaron, Charlottesville, va., on brief), for appellee and cross-appellant.
 Before HAYNSWORTH, BOREMAN and BRYAN, Circuit Judges.
 BOREMAN, Circuit Judge.
 
 
 1
 This is another in a series of complicated and troublesome appeals from decisions of the District Court for the Western District of Virginia in proceedings in bankruptcy involving the affairs and estate of Sterling R. Decker, bankrupt.
 
 
 2
 By order entered as of July 3, 1962, the Referee in Bankruptcy made findings of fact, in narrative form, and stated certain conclusions. Both George Gilmer and the Trustee in Bankruptcy filed petitions for review of that order by the District Court. Upon certifying the matters for such review the referee set forth, in fifty-three enumerated paragraphs, detailed findings of fact and stated separate conclusions of law. The District Court entered its order reversing in part and affirming in part the referee's order of July 3, 1962. It is from this order of the court below that George Gilmer appeals and Woodson, the Trustee in Bankruptcy, cross-appeals.
 
 
 3
 As to all except three of the fifty-three particularly enumerated findings of fact by the referee, which are substantially the same as the facts recited in the referee's order of July 3, there is no material disagreement between the parties here so that the primary issues presented are whether the facts so found support the conclusions reached below.
 
 
 4
 In December 1956, Sterling R. Decker, hereinafter referred to as Decker, together with Charles Hurt, purchased, and subdivided into residential lots, a tract of land consisting of 110.68 acres of land known as Berkeley. The land was purchased from W. Hallam Tuck and part of the purchase price was evidenced and paid by a $16,000.00 deferred purchase money bond, hereinafter referred to as the 'Tuck bond,' executed by Decker and Hurt and secured by a deed of trust against the property. In early 1957 George Gilmer, a Charlottesville lawyer, and three other persons acquired Hurt's interest in the land and assumed among them Hurt's liability on the Tuck bond. Thereafter, Decker, Gilmer and the other co-owners entered into an agreement giving Decker an option to purchase the interest of the others in the lots in Berkeley at a certain fixed price and providing that Decker alone would develop Berkeley as a residential area.
 
 
 5
 Decker began development in 1957 in partnership with his wife under the name of Berkeley Community Builders. In time he organized Commonwealth Utilities, Inc., to provide a water and sewer system for the subdivision. All of the common stock of this corporation was owned by Decker and his wife except one share owned by Gilmer. Decker also organized Albert Mahanes Company, Inc., to perform the grading, earth moving, ditching and road building. Of this corporation Decker owned fifty per cent and Albert Mahanes owned fifty per cent. Decker himself was in charge of the direction, operation and bookkeeping of all three organizations.
 
 
 6
 In the development of Berkeley into a residential subdivision, entailing the purchase of his co-owners' outstanding interest in the lots, reselling them and building houses thereon for the ultimate purchasers, Decker began to require large amounts of working capital which he could not provide. He arranged with Mr. Adams, an officer of the Peoples National Bank, to obtain funds from the bank upon the personal credit of Gilmer, a man of considerable means whose credit appeared to be substantially unlimited. Under the arrangement, whenever Decker needed funds for his undertaking he executed unsecured promissory notes in the amounts desired, obtained the endorsement of Gilmer thereon and discounted the notes at the bank.
 
 
 7
 This credit arrangement with Gilmer and the bank operated for a period of approximately two years during which time it was clearly shown that when he devoted his time and close attention to the project, Decker was able to make the Berkeley operation successful and highly profitable. However, during the latter part of 1960 and the early part of 1961, Decker, apparently because of involvement in a number of other ventures which attracted his interest and with the forlorn hope of adding to his income, began to neglect the Berkeley project and, as a result, was faced with increasingly serious financial problems. He had, without the consent or knowledge of either the bank or Gilmer, diverted funds borrowed under the credit arrangement for use in the Berkeley project to his other business ventures. This situation was first discovered by the bank during the early part of 1961 when it was obvious that Decker's loans were not being repaid satisfactorily.
 
 
 8
 Both Mr. Adams of the bank and Gilmer became concerned about Decker's situation and, because they had been financing Decker so heavily, decided to acquire some sort of control over his financial activities, to attempt to dissuade him from engaging in other ventures and force him to concentrate his efforts toward developing Berkeley. As of March 27, 1961, the bank was holding promissory notes executed by Decker and endorsed by Gilmer in the total aggregate sum of $249,199.31. Additionally, the bank was holding promissory notes of Albert Mahanes Company aggregating $22,479.34 and a promissory note of Commonwealth Utilities, Inc., in the amount of $70,000.00, all of which notes were endorsed by both Decker and Gilmer.
 
 
 9
 On March 27, 1961, Decker and his wife executed a deed of trust, covering virtually all of their real estate, and a bond payable to bearer on demand in the amount of $260,000.00, with interest at the rate of 6% Per annum, secured by the deed of trust. The bond and deed of trust were delivered to and held by the bank as collateral security for the payment of the promissory notes executed by Decker and endorsed by Gilmer pursuant to a plan intended, in part, to enable Gilmer and the bank to exercise more control over Decker's finances, as well as to provide security to Gilmer as endorser of Decker's promissory notes held by the bank. An 'escrow' account was established under the control of Gilmer and a 'reserve' account was established under the control of the bank to handle all of the income and expenses attributable to certain aspects of the Berkeley project. The secured bond was drawn in an amount in excess of the then aggregate amount of the Decker notes endorsed by Gilmer to enable the bank to subsequently lend more money to Decker under the plan and bring these loans under the security thus afforded. Evidencing this purpose, there is printed on the back of the bond the following:
 
 
 10
 'This bond is held primarily as security for any notes of Sterling R. Decker and/or Mary Jane Decker endorsed by George Gilmer now or hereafter held by The Peoples National Bank of Charlottesville, Virginia.'
 
 
 11
 After the new financing plan went into effect, there was a flurry of activity by Decker in the Berkeley subdivision and it appeared that the project was back on the road to success. In fact, several new houses were sold, others were constructed and sold under financially profitable arrangements, and progress was made in paying claims of various creditors. However, several of Decker's miscellaneous creditors began to press him for payment and by November 15, 1961, the bank felt it necessary to demand payment of all the Gilmer-endorsed notes on which Decker was either maker or endorser. Accordingly, on that date Gilmer paid and took an assignment from the bank of all the Gilmer-endorsed Decker notes in the aggregate sum of $247,275.00.
 
 
 12
 By two supplemental deeds of trust dated August 10, 1961, and October 20, 1961, recorded September 5, 1961, and October 31, 1961, respectively, Decker and his wife conveyed in trust their one-half interest in a total of twenty-one additional lots in Berkeley Subdivision to secure the $260,000.00 demand bearer bond dated March 27, 1961. The involuntary bankruptcy petitions were filed herein on December 11, 1961, and it is conceded by all parties, as was found by the referee, that the liens of these two supplemental deeds of trust fall within the four-month period preceding bankruptcy. The referee and the court below held that the two supplemental deeds of trust constituted voidable preferences under section 60, sub. a(1) of the Bankruptcy Act, having been given as additional security for antecedent debts. Gilmer contends that the transfers did not enable him to obtain a greater percentage of his debt than any other creditor of the same class and hence were not voidable preferences. The contention in this regard, which we find to be wholly without merit, is based upon the fact that immediately prior to the recordation of these deeds of trust, Gilmer released from the lien of the original $260,000.00 deed of trust a number of lots of substantial value. When these lots were so released they, or the proceeds from their sale, became part of the assets of Decker's estate. Clearly, if not voided, the supplemental deeds of trust would constitute transfers which would effectively enable Gilmer to obtain a greater percentage of his debt than other unsecured creditors. The fact that Gilmer had voluntarily relinquished an even better position earlier is wholly immaterial.
 
 
 13
 The main issue before us is whether the $260,000.00 deed of trust dated March 27, 1961, within one year prior to bankruptcy was, upon the facts as found by the referee and approved by the District Court, properly held to be void as a fraudulent transfer under the provisions of either section 67, sub. d(2)(a) or section 67, sub. d(2)(d) of the Bankruptcy Act.[1]
 
 
 14
 In his order of July 3, 1962, hereinbefore mentioned, the referee found as facts that Decker's business was not materially curtailed, if curtailed at all, by the recordation of said deed of trust; that said deed of trust was not executed with bankruptcy in mind; that, except insofar as the conveyance was made to secure debts of Albert Mahanes Company, Inc., and Commonwealth Utilities, Inc., said deed of trust and the $260,000.00 bond thereby secured were not executed and delivered with an intent to hinder, delay or defraud creditors; and that the amount of the antecedent primary debts of Decker which said deed of trust was given to secure was not disproportionately small as compared with the value of the property transferred in trust. The referee further found, however, that insofar as the deed of trust was given as security for the payment of debts of Albert Mahanes Company, Inc., and Commonwealth Utilities, Inc., the transfer was without consideration of any kind in that Decker's liability thereon was purely secondary as endorser rather than as maker.
 
 
 15
 Whether or not Decker's secondary liability as endorser of the notes of the two corporations was sufficient consideration in legal contemplation to support the deed of trust or any part thereof is, it seems, entirely beside the point. As was found by the referee, based upon substantial evidence in the record, the bond which the deed of trust was given to secure was itself not intended to encompass Decker's possible liability on these notes but only notes of Decker and/or his wife endorsed by George Gilmer, as is evidenced by the wording on the back of the bond hereinbefore quoted. There is, therefore, no logical basis upon which to predicate a claim that the deed of trust was given as security for these Mahanes Company and Commonwealth Utilities corporation notes.
 
 
 16
 Based upon his findings of fact stated above, the referee, in his original order of July 3, 1962, concluded, as a matter of law, that the deed of trust of March 27, 1961, was not voidable as a fraudulent transfer under the provisions of either section 67, sub. d or section 70, sub. e of the act. However, in his certification to the District Court, the referee stated that he felt that his initial conclusion had been wrong and that the deed of trust was voidable under the provisions of section 67, sub. d(2)(a) in that the element of 'fair consideration,' as that term is defined in section 67, sub. d(1)(e),[2] was lacking in the particular circumstances of the case and that Decker was insolvent at the time the transfer was made. The court below not only affirmed this portion of the referee's ultimate conclusions but went even further, stating that 'the evidence convinces this court that, in the execution of the deed of trust of March 27, 1961, the bankrupts had the actual intent to hinder and delay existing and future creditors,' and holding that the deed of trust was therefore fraudulent and voidable under section 67, sub. d(2)(d) as well. In this latter conclusion the court in effect held that there was no substantial evidence in the record to support the referee's finding that the deed of trust was not given with an intent to hinder, delay or defraud creditors. We feel that the referee's finding in this regard is supported by substantial and credible evidence and that the action of the District Court in this particular was error. As stated by the referee in his original order, 'All parties who were parties to the preliminary discussions leading up to the $260,000.00 deed of trust, with the exception of Mary Jane Decker who has not testified, have testified that it was not the intent of the bankrupts to delay, hinder, or defraud creditors by the execution and recordation of said deed of trust.' As to any other evidence in the record offered to refute this direct testimony as to intent, we agree with the further statement of the referee in said order that 'from the record in this proceeding, it cannot be determined with any degree of certainty that the bankrupts at the time of the execution and delivery of said deed of trust had an intent to hinder, delay, or defraud, or that the deed of trust was subsequently employed for such fraudulent purposes,' and that 'to set aside as fraudulent a conveyance such as this on no stronger evidence of intent to defraud than is demonstrated by the evidence would subject to successful attack in bankruptcy many bona fide transactions.' Where the referee's findings are based upon conflicting evidence, as here, the reviewing court should not disturb such findings unless they are not supported by any substantial evidence or there is most cogent evidence of mistake and miscarriage of justice. See, generally, 2 Collier on Bankruptcy, paragraph 39.28 (14th Ed. 1962); 8 Remington on Bankruptcy, 3418 (1955).
 
 
 17
 Whether the referee's amended conclusion, affirmed by the District Court, that the deed of trust was voidable under the provisions of section 67, sub. d(2)(a) is based upon a correct construction of the applicable law and supported by substantial evidence in the record is next to be determined. In order to come within the terms of section 67, sub. d(2)(a),[3] the transfer to be voidable must have been made without 'fair consideration,' as that term is defined by section 67, sub. d(1)(e),[4] and by a debtor who is or will be thereby rendered insolvent. Under this particular provision the actual intent of the debtor is not material.
 
 
 18
 The referee found as a fact that as of the date of the deed of trust Decker and his wife were insolvent. This was in effect affirmed by the court below and we cannot say that, in the light of the evidence in the record, such finding was clearly wrong. As the statutory definition should be applied to the instant case, consideration for the bond and deed of trust was 'fair' if it was received in good faith to secure an antecedent debt in an amount not disproportionately small as compared with the value of the property conveyed in trust and the obligation obtained.[5] As we previously noted, the referee found as a fact that the deed of trust was given to secure an antecedent debt in an amount not disproportionately small as compared to the value of the property conveyed in trust. The only remaining issue to be considered and resolved with regard to voidability is whether the deed of trust was 'received in good faith.' The referee concluded, in effect, that George Gilmer, in receiving the deed of trust did not act in 'good faith' as that term has been defined by the courts. In his discussion of this issue in the certification to the Distriot Court, the referee based his conclusion of lack of good faith ostensibly upon the following findings: That Mr. Gilmer was legal counsel for the Deckers and was thoroughly familiar with their affairs; that at the time of the giving of the deed of trust the Deckers were indebted to many creditors who held no security; and that if this deed of trust is set aside, the benefits will inure to all unsecured creditors whose claims are allowed in the bankruptcy proceeding. The District Court simply affirmed on the basis of the referee's findings and conclusions.
 
 
 19
 The rationale of the referee's conclusion, although not entirely clear, seems to be that since Gilmer had been a close personal friend and the regular legal counsel for the Deckers for several years he was, at least presumably, familiar with their affairs and he should have known that the Deckers were insolvent at the time the deed of trust was given.
 
 
 20
 It is clear that 'fair consideration,' as the term applies to the instant case, requires both an antecedent debt which is in an amount not disproportionately small as compared with the value of the deed of trust lien and good faith. See Cohen v. Sutherland, 257 F.2d 737 (2 Cir. 1958). It is equally clear that in the case of one who receives security for, or property in satisfaction of, an antecedent debt, as distinguished from one who receives a transfer for a present consideration, good faith cannot be said to be lacking unless the transferee knowingly participated in the debtor-transferor's purpose to defeat other creditors or lacked good faith in valuing the property exchanged. See 4 Remington on Bankruptcy, 1654 (1957). In the instant case it was found as a fact that the debtor-transferor (Decker) had no intent to defeat other creditors, so there neither was nor could there be any finding that Gilmer knowingly participated in any such intended purpose. Further, the antecedent debt sought to be secured was $249,199.31, and the value of the security received was $260,000.00. The valuation of the antecedent debt and the deed of trust is not questioned and the referee found as a fact, justifiably, that the antecedent debt thus secured was not disproportionately small. Under these circumstances, Gilmer cannot be held to have lacked good faith with respect to valuing either the debt or the security obtained. We think the conclusion of the referee in this particular and the affirmance thereof by the court below cannot be sustained.
 
 
 21
 We next consider certain claims of Gilmer arising out of his endorsement of Decker's notes discounted at the bank. Although there is a dispute on the particular point, we agree with the finding of the District Court that there is revealed by the evidence a clearly understood verbal contract between Decker and Gilmer that Gilmer was to receive, for lending his credit by endorsing these notes, a fee, initially at the rate of 6% Per annum (calculated on the face amount of each endorsed note while unpaid at the bank) which after March 27, 1961, was reduced to 3% Per annum (calculated on $260,000.00, the face amount of the bond described in the March 27, 1961, deed of trust given to secure then existing Gilmer endorsed notes and others to be thereafter endorsed and held by the bank). The referee held that any amounts which Gilmer had collected on account of his endorsements (the exact amounts not then known but to be later ascertained) should be credited to reduce the principal of the endorsed notes and that Gilmer's claim for any unpaid endorsement fees should be disallowed. However, it is clear from the record, as found by the District Court, that the bank, not Gilmer, was the actual lender, that the bank had no interest whatsoever in such payments and that the fees or charges were not usurious. The District Court properly reversed the finding and conclusion of the referee and held that the endorsement fees to Gilmer, both paid and unpaid, were lawful. See Chakales v. Djiovanides, 161 Va. 48, 170 S.E. 848 (1933); Keagy v. Trout, 85 Va. 390, 7 S.E. 329 (1888); annot. 52 A.L.R.2d 703, 710 et seq. (1957).
 
 
 22
 The next question presented arises from Gilmer's claim of the right to retain as collateral for a $16,000.00 note the Tuck bond, hereinbefore mentioned. Included in the $247,275.00 worth of Decker-made, Gilmer-endorsed notes which Gilmer was required to pay on November 15, 1961, was a $16,000.00 note, the proceeds of which had been used to satisfy the obligation to Tuck on the Tuck bond. As before stated, the original makers of the Tuck bond were Decker and Charles Hurt, and the bond was secured by a deferred purchase money deed of trust on the remaining Berkeley lands. Tuck, the payee and holder of the bond, wanted his money and had threatened foreclosure under his deed of trust. In order to obtain the money to satisfy Tuck, Decker executed the $16,000.00 note and Gilmer endorsed it with the alleged understanding that the Tuck bond be purchased rather than paid and assigned to Gilmer as collateral not only for the $16,000.00 note but also for any other debts of Decker. The $16,000.00 note was taken by the bank on June 13, 1961, and on that same date the Tuck bond was placed in Gilmer's personal collateral file. The Tuck bond is endorsed, 'For value received the within bond is assigned to George Gilmer without recourse. W. Hallum Tuck by Robert Musselman, attorney.' The referee ordered Gilmer to surrender the bond to the trustee and release any lien given to secure its payment. The only reasons assigned by the referee for his disposition of this matter were: That there was no evidence to support Gilmer's contention that there was an agreement between him and Decker that the latter would borrow $16,000.00 to pay Tuck and would then permit Gilmer to hold the Tuck bond as additional security; since the payment of one-half of this bond had been assumed by others, Decker should not have been required by Gilmer or anyone else to borrow funds to pay a debt for which others were obligated. The District Court affirmed the referee's order as 'plainly right' for reasons set out by the referee.
 
 
 23
 No authority has been cited by the referee, the court below or any of the parties respecting the issue of the Tuck bond and deed of trust. Gilmer contends that since he in effect paid the $16,000.00 debt to Tuck by taking up the $16,000.00 note which he had had endorsed, he is entitled to hold the Tuck bond assigned to him and the deed of trust securing it, conceding, however, that he claims the protection of this collateral security only to the extent of $8,000.00, Decker's proportionate obligation on the Tuck bond. We are of the opinion that, irrespective of the reasons assigned, the referee's order should be sustained. When Gilmer and the others assumed Hurt's liability on the bond, they became jointly and severally primarily liable thereon, and the subsequent payment thereof by Gilmer discharged and extinguished the bond, no matter what his intention may have been. See Cussen v. Brandt, 97 Va. 1, 32 S.E. 791, 793 (1899) (dictum); Perkins v. Hall, 123 W.Va. 707, 17 S.E.2d 795 (1941); 11 Am.Jur.2d, Bills and Notes, 963 (1963); 10 C.J.S., Bills and Notes, 449 (1938); Va.Code, 6-472(1) (Michie 1950).
 
 
 24
 The case will be remanded for further proceedings not inconsistent with this opinion.
 
 
 25
 Affirmed in part, reversed in part and remanded.
 
 
 
 [1]
 Section 67, sub. d(2) of the Bankruptcy Act, 11 U.S.C.A. 107, sub. d (2), provides as follows:
 'Every transfer made and every obligation incurred by a debtor within one year prior to the filing of a petition initiating a proceeding under this title by or against him is fraudulent (a) as to creditors existing at the time of such transfer or obligation, if made or incurred without fair consideration by a debtor who is or will be thereby rendered insolvent, without regard to his actual intent; * * * or (d) as to then existing and future creditors, if made or incurred with actual intent as distinguished from intent presumed in law, to hinder, delay, or defraud either existing or future creditors.'
 
 
 [2]
 Section 67, sub. d (1) of the Bankruptcy Act, 11 U.S.C.A. 107, sub. d(1), in defining the terms applicable to subdivision (d) of section 67, provides:
 '(e) consideration given for the property or obligation of a debtor is 'fair' (1) when, in good faith, in exchange and as a fair equivalent therefor, property is transferred or an antecedent debt is satisfied, or (2) when such property or obligation is received in good faith to secure a present advance or antecedent debt in an amount not disproportionately small as compared with the value of the property or obligation obtained.'
 
 
 [3]
 See footnote 1, supra
 
 
 [4]
 See footnote 2, supra
 
 
 [5]
 Section 67, sub. d(1)(e)(2), supra, footnote 2