In the Matter of Curtis Lee **TAYLOR**, Individually and t/a Taylor's Lumber Manufacturer, Bankrupt.

No. 67–BK–152.

United States District Court
W. D. Virginia,
Danville Division.

Dec. 16, 1968.

See also D.C., 279 F.Supp. 932.

Allen Garrett, Danville, Va., for bankrupt Taylor.

William F. Stone, Martinsville, Va., for Piedmont Trust Bank.

Philip H. Hickson, Lynchburg, Va., Referee in Bankruptcy.

## OPINION and JUDGMENT

DALTON, Chief Judge.

The bankrupt, Curtis Lee Taylor, is alleged by the objecting creditor, the Piedmont Trust Bank, to have committed acts which, under the provisions of section 14(c) of the Bankruptcy Act, as amended, 11 U.S.C. § 32(c), require this court to deny his discharge in bankruptcy. In particular, the Piedmont Bank alleges that the bankrupt (1) "while engaged in business as a sole proprietor * * * obtained for such business money or property on credit or as an extension or renewal of credit by making or publishing * * * a materially false statement in writing respecting his financial condition * * *," (section 14(c) (3) of the Bankruptcy Act); (2) within twelve months immediately preceding the filing of the petition in bankruptcy, "transferred, removed, destroyed, or concealed, or permitted to be removed, destroyed, or concealed, any of his property with intent to hinder, delay, or defraud his creditors," (section 14(c) (4) of the Bankruptcy Act); or (3) "has failed to explain satisfactorily * * * losses of assets or deficiency of assets to meet his liabilities," (section 14(c) (7) of the Bankruptcy Act).

After a hearing upon these objections they were overruled by the referee and a discharge was granted. Thereupon the Piedmont Bank filed a petition for review by this court of the referee's order.

In regard to the second ground for denial of discharge it is alleged that Taylor, with fraudulent intent, had cut, removed and sold timber which had been mortgaged to the Piedmont Bank. The referee observed that the testimony on this point was in irreconcilable conflict, but noted that the bankrupt's testimony

was supported by testimony of other witnesses and by his business records. This, along with the fact that Taylor deposited the proceeds from the sale of the lumber in his business account with the Bank, that funds from this account were later used to make a loan payment, and that Taylor testified that at the time the lumber was cut he was not aware that the particular timber was that which had been mortgaged to the Bank, was sufficient to convince the referee that a fraudulent intent on the part of Taylor was lacking. Since this finding is based on substantial evidence, Gilmer v. Woodson, 332 F.2d 541 (4th Cir. 1964), is not clearly erroneous, General Order in Bankruptcy No. 47, 28 U.S.C.A. Rules; see Losner v. Union Bank, 374 F.2d 111 (9th Cir. 1967) and is entitled to great weight, being based upon conflicting evidence and involving judgment as to credibility of witnesses, 2 Collier on Bankruptcy, para. 39.28 (14th Ed. 1968), this court will not find otherwise.

As for the objection under 14(c) (7) that the bankrupt has failed to satisfactorily explain losses of assets, we agree with the referee that the evidence introduced to support this objection was insubstantial. The record reveals no unexplained losses of assets. It seems that the Piedmont Bank is relying on this ground of objection as an alternative to the first ground alleged, arguing that if the bankrupt's financial statements were not materially false, then he has failed to satisfactorily explain the apparent inaccuracies contained in the statements. The question, as we see it, is not whether the bankrupt has satisfactorily explained losses of assets, but whether the financial statements are materially false within the meaning of section 14(c) (3).

The findings of fact by the referee germane to the 14(c) (3) objection to discharge are as follows:

Curtis Lee Taylor, the bankrupt, learned the sawmilling business from his father, who had been a sawmill owner-operator for many years. His father had established a banking connection for his lumber business with the Piedmont Trust Bank, the objecting creditor in this proceeding, in 1945. Around 1957 the father and son formed a partnership for continuing the lumber business, which consisted of the purchase of standing timber, operation of a sawmill and sale of the rough lumber manufactured. In 1963 the father retired and Taylor continued the sawmill operation under the sole proprietorship until bankruptcy intervened.

In April, 1963, the Piedmont Trust Bank loaned the bankrupt $20,825 upon his note, repayable in thirty-five monthly installments of $579, and secured by a purchase money lien on sawmill equipment. On September 26, 1964, the Piedmont Bank requested and the bankrupt filed a financial statement which has since become a subject of controversy in this proceeding. The Bank apparently desired the financial statement to conform its records to banking regulations, since the Bank at that time had on file no previous financial statement of Taylor's sawmill business under his sole management. No new loan was requested or made, nor was credit renewed or extended at the time this financial statement was submitted to the Bank. December 2, 1964, the bankrupt applied for and was granted a loan of $15,000 by the Bank for use in his sawmill business. This loan was made without security upon the promissory note of Taylor, and the loan amount was deposited to the business checking account of Taylor with the Piedmont Bank. Taylor applied for and obtained a second loan of $10,000 from the Bank on May 1, 1965, again on his unsecured note, and the amount was credited to the business checking account. A second financial statement was furnished by the bankrupt on September 24, 1965, at the request of the Bank, although no loan or extension of credit was requested or granted at that time.

In early 1966 the Piedmont Bank called upon the bankrupt to furnish collateral for the security of his note ac-

count of $25,000. On February 5, 1966, the bankrupt executed and delivered to the Bank a mortgage on standing timber located on a sixty-acre tract of land, and a mortgage on an eighty-six acre tract of timber land.

To evidence the mortgage debt five notes for $5,000 each, maturing one note annually and bearing interest at six percent, were executed by Taylor as a renewal of note debts.

On February .2, 1966, the bankrupt paid the first of his mortgage notes in the principal amount of $5,000 and paid interest in the amount of $1,500. Sometime prior to this Taylor had repaid the $20,825 loan which had been obtained in 1963. On February 6, 1966, Taylor applied for an additional loan of $10,000 and offered a third financial statement.

However, no loan was granted and the unsigned financial statement was not the basis of a loan or extension of credit.

Upon the bare facts outlined above must be superimposed several hazy details which give rise to the issues raised in this petition for review.

At the hearing on the objections by Piedmont Bank to the discharge of Taylor, two of the Bank's officers testified as to their course of dealings with Taylor, and in particular, as to the accuracy of the two financial statements given by the bankrupt in 1964 and 1965. The testimony of the Bank's vice-president and comptroller, which has not been refuted by any evidence introduced by the bankrupt, showed that the September 26, 1964 financial statement contained the following figures:

| ASSETS | | LIABILITIES | |
|---|---|---|---|
| Cash | 3,000 | Real Estate | |
| Accts. Rec. | 5,000 | Mortgages | 12,000 |
| Real Estate | 25,000 | Chattel Mortgages | 11,600 |
| Sawmill Equipt. | 40,000 | | |
| Total Assets | 73,000 | Total Liabilities | 23,600 |
| | | Net Worth | 49,400 |

The estimates of the Bank's vice-president as to the actual financial status of the bankrupt's business, at that time, based upon income tax returns, depreciation schedules, the records from the bankrupt's checking account, his schedule of assets at the time of the bankruptcy petition, and other sources, presented the following picture:

Estimate of Actual Assets and Liabilities
as of September 26, 1964

| ASSETS | | LIABILITIES | |
|---|---|---|---|
| Cash | 3,000 | Notes Payable | 25,000 |
| Accts. Rec. | 5,000 | Real Estate | |
| Real Estate | 25,000 | Mortgages | 12,000 |
| Sawmill Equipt. | 22,000 | Chattel Mortgages | 11,600 |
| Total Assets | 55,000 | Total Liabilities | 48,600 |
| | | Net Worth | 6,400 |

The differences in the two sets of figures result from an inflated value given the sawmill equipment and the omission of two notes payable to two

banks other than the Piedmont Bank. According to the testimony of the Bank's vice-president, the actual cost of the sawmill equipment listed in the September 26, 1964 financial statement was approximately $32,000. Depreciation through September, 1964 would reduce its value to about $22,000. On the liability side, Taylor omitted two notes. The first was made on March 2, 1964, payable to the First National Bank of Martinsville, Virginia, in the amount of $10,442, repayable in thirty monthly installments. The second originated on May 30, 1964 and was an open note on machinery in an amount of $18,097. Assuming these notes were reduced by regular payments, a substantial balance, approximately $25,000, was still owing as of September, 1964. It further appears that the cash figure of $3,000 and the notes receivable figures totaling $5,000 could not be substantiated from the records available to the Bank's witness, and that the value of the real estate listed by Taylor actually sold for $16,100 three years later at a forced sale. Giving the bankrupt the benefit of reasonable doubts, it nevertheless appears that a fairly accurate approximation of his net worth as of the date of the first financial statement was as shown above.

On December 2, 1964, Taylor went to the Piedmont Bank for the purpose of obtaining a loan of $15,000 for use in his lumber business. At the hearing on objections to discharge, the president of the Bank testified unequivocally that the $15,000 loan was granted in reliance upon the September 26, 1964 financial statement. Similar assertions were made in regard to the $10,000 loan of May 1, 1965.

Approximately one year after the first financial statement was submitted to the Bank, the Bank again requested and received a financial statement dated September 24, 1965 from Taylor. On this latter statement Taylor listed his assets and liabilities as follows:

| ASSETS | | LIABILITIES | |
|---|---|---|---|
| Savings | 3,000 | | |
| Cash | 3,000 | Notes | 25,000 |
| Accts. Rec. | 2,000 | Real Estate | |
| Real Estate | 25,000 | Mortgage | 11,000 |
| Life Ins. | 10,000 | Chattel Mortgages | 7,000 |
| Growing Timber | 25,000 | Total | 43,000 |
| Sawmill Equipt. | 40,000 | Net Worth | 65,000 |
| Total | 108,000 | | |

The testimony of the Bank's vice-president reveals that the savings figure was probably in error, since interest income reported on Taylor's tax return for the year was only $14.74. The real estate was the same as that reported on the first statement. The life insurance cash surrender value of $10,000 conflicts with the $2,000 figure scheduled in the bankruptcy petition. The growing timber, valued by Taylor and listed at $25,000, could not be substantiated from the records available to the Bank's witness. All the timber which the bankrupt acquired during this period—the 86 acre and 60 acre tracts mentioned above— were acquired after the submission of this financial statement. Taylor's tax returns for the years 1964 and 1965 showed that he had sold more equipment than he had acquired during the period, and in the estimate of the Bank's witness, the value of the sawmill equipment at the time of the financial statement was $16,500. On the liability side, the two loans omitted from the 1964 statement were still outstanding as of September 24, 1965 and were again omitted.

The Bank's estimate of Taylor's assets and liabilities at the time of the second financial statement was approximately the following:

| ASSETS | | LIABILITIES | |
|---|---|---|---|
| Real Estate | 25,000 | Notes | 40,000 |
| Life Insurance | 2,000 | Real Estate | |
| Sawmill Equipt. | 16,500 | Mortgage | 11,000 |
| | | Chattel Mortgages | 7,000 |
| Total | 43,000 | Total | 58,000 |
| | | Net Worth | 15,000 |

The two loans of $10,000 and $15,000 obtained from the Bank by Taylor matured in October and November in 1965. These notes were renewed by the Bank on December 4, 1965, and according to the Bank's witness, they were renewed on the basis of the September 24, 1965, financial statement. The following February the Bank requested that Taylor furnish collateral for the security of these notes, at which time Taylor delivered the two mortgages and executed the five $5,000 renewal notes mentioned above.

Upon cross-examination the witnesses for the Bank reaffirmed that the financial statements had been relied upon in granting and renewing the two loans, that they had no reason to doubt the accuracy of the financial statements, and that the omissions and inaccuracies in the two financial statements were as related by the Bank's vice-president.

At the close of the testimony by the Bank's witnesses the referee ruled that the Bank had established a prima facie case with regard to certain of the specifications of objections to the discharge, although he did not indicate in particular that the section 14(c) (3) objection—obtaining credit on the basis of materially false financial statements—amounted to a prima facie case. However, the natural inference of the referee's ruling, in view of the preceding testimony, would be that the Bank had established reasonable grounds to believe that the bankrupt had committed an act which, under section 14(c) (7), would require a denial of the discharge. The referee advised the counsel for the bankrupt that he should go forward with some testimony. However, in the interest of expediency, and apparently in the belief that the testimony of the bankrupt on two previous occasions was sufficient to meet his burden of proof, the counsel for the bankrupt declined to put Taylor on the stand for direct examination. Counsel for the Bank understandably chose not to cross examine Taylor.

### Conclusions Of Law

The controlling principles are contained in section 14 of the Bankruptcy Act, 11 U.S.C. § 32, which in subsection (c) provides:

> The court shall grant the discharge unless satisfied that the bankrupt has * * * (3) while engaged in business as a sole proprietor, * * * obtained for such business money or property on credit or as an extension or renewal of credit by making or publishing * * * a materially false statement in writing respecting his financial condition * * *.

Subsection (c) (7) of section 14, U.S.C. § 32(c) (7) further provides in part:

> That if, upon the hearing of an objection to a discharge, the objector shall show to the satisfaction of the court that there are reasonable grounds for believing that the bankrupt has committed any of the acts which, under this subdivision, would prevent his discharge in bankruptcy, then the burden of proving that he

has not committed any of such acts shall be upon the bankrupt.

The questions presented by the petition for review in regard to the section 14(c) (3) objection and ruling of the referee are, first, whether the Piedmont Trust Bank, the objecting creditor, established reasonable grounds for believing that the bankrupt has obtained money or credit on the basis of a materially false financial statement, and second, assuming that the Bank has established reasonable grounds for such belief, whether the bankrupt has met his burden of proving that he did not commit the act in question.

■ Two essential elements of the section 14(c) (3) act which bars a discharge in bankruptcy are (1) that the false financial statement was relied upon to some extent by the person from whom the bankrupt obtained money or property on credit, or an extension or renewal of credit, Banks v. Siegel, 181 F.2d 309 (4th Cir. 1950), and (2) that the financial statement was made by the bankrupt with knowledge of its falsity and with an intent to deceive, 1 Collier on Bankruptcy, para. 14.40 (14th Ed. 1968). The requisite intent is present if the financial statement was made " * * * either with actual knowledge that it was incorrect, or with reckless indifference to the actual facts, without examining the available source of knowledge which lay at hand, and with no reasonable ground to believe that it was in fact correct." Morimura, Arai & Co. v. Taback, 279 U.S. 24, 33, 49 S.Ct. 212, 215, 73 L.Ed. 586 (1929); In re Finn, 119 F.2d 656 (3rd Cir. 1941); see also 1 Collier on Bankruptcy, para. 14.40, supra, and cases cited therein.

The referee, in granting the discharge, found the evidence to be insufficient to establish to his satisfaction either of these two elements. His conclusions with regard to the Bank's reliance on the first financial statement was: (1) the statement was undoubtedly requested by the Bank to conform its records to banking regulations; (2) the statement was obviously incomplete and represented nothing more than general estimates to experienced bankers even if casual notice was taken of it at the time it was given; (3) it was requested, accepted and filed as a routine banking matter, and (4) the evidence was "totally lacking" that any material reliance was placed on this financial statement. Additionally, the referee found that there was no evidence that any further loan was made, renewed, or credit extended subsequent to, or on the basis of, the second financial statement.

As to the second element, the bankrupt's intent to deceive, the referee found that Taylor could reasonably have believed that the value of his real estate and sawmill equipment was as listed, and that the evidence regarding the omission of the two loans totalling about $25,000 did not reveal a deliberate intent to deceive: "Whether the omission was through oversight or carelessness or was deliberate was not established. It appears to have been inconsequential to the bankrupt and the evidence was lacking to relate the omission to a fraudulent design."

The sources of these conclusions by the referee, other than the fact that neither financial statement was submitted contemporaneously with a loan or renewal of credit, nowhere appear in the record. The Bank's witnesses repeatedly testified that the loans and renewal notes were made in reliance upon one or the other financial statement, and the cross-examination of the witnesses did not make their assertions less credible. The president of the Bank testified as to discussions with the bankrupt at the time of the first loan and said that the first financial statement was relied upon. This testimony indicates that the president was a party to the loan negotiations, and if he was not in fact present, as the referee apparently suspects, this fact was not brought out at the hearing. The Bank's vice-president stated that it was the policy of the Bank to lend money on the basis of financial statements when loans are made without security, and that every commercial loan and financial

statement, including Taylor's, came to his attention.

While the testimony of the Bank's own witnesses need not be taken at face value, nothing in the previous testimony of Taylor or the other witnesses on his behalf sheds the least light on the loan transactions or casts the slightest doubt on the credibility of the Bank's witnesses. None of the testimony of Taylor at the previous hearings either relates to or explains the discrepancies and omissions on the financial statements. On this state of the evidence the referee ruled that the Bank had established reasonable grounds to believe that the bankrupt had committed acts upon which a denial of discharge could be predicated. At this point the burden of proof shifted to the bankrupt under section 14(c) (7) and the Bank rested its case. Nevertheless, without a shred of evidence being subsequently introduced by the bankrupt, the referee granted the discharge.

The referee's conclusions, regardless of how well founded they might be in his own mind, nevertheless appear to be based upon pure speculation and a measure of doubt as to the credibility of the Bank's witnesses even though nothing in the record contradicts their testimony. While this court might be disposed to agree with the referee's conclusions if the evidence were conflicting, in this case the record is devoid of any substantial evidence upon which this court might rely in upholding the findings of the referee. Gilmer v. Woodson, 332 F.2d 541 (4th Cir. 1964).

■ The error of the referee apparently lies in a misconception concerning the burden of proof requirement of section 14(c) (7), quoted above. In a previous hearing upon specifications of objections to discharge filed by a creditor other than the Piedmont Bank the referee stated that it was his understanding of section 14(c) (7) that if there exists reasonable grounds to believe that a cause of denial of discharge has been committed then the bankrupt shall go forward with the evidence, and "I think that this is something less than burden of proof." Indeed it is, since in civil cases the burden of going forward with the evidence may shift from the plaintiff to the defendant, while the so-called risk of non-persuasion remains with the plaintiff throughout the trial. But this has not been the law under section 14 (c) (7) since the 1926 amendment to then section 14(b), now section 14(c). Rather:

The burden which shifts now upon a showing of reasonable grounds is not a *burden of going forward* with the evidence requiring the bankrupt to explain away natural inferences, but a *burden of proving* that he has not committed the objectionable acts with which he has been charged; the bankrupt now has the risk of ultimately persuading the court that the allegations in the specifications are untrue once the objector has shown that there are reasonable grounds for believing that the bankrupt has committed one or more of the acts enumerated in 14c. If the evidence is in a state of substantial equilibrium, the discharge must be denied since the bankrupt has failed to carry his burden of proof. [footnotes omitted]

1 Collier on Bankruptcy, para. 14.12, pp. 1313–1314 (14th Ed. 1968).

■ The record before this court reveals that the two financial statements submitted by the bankrupt to the Bank were false. We must conclude, as apparently did the referee, that the Bank has established reasonable grounds to believe that either or both of the financial statements were submitted by the bankrupt with the requisite intent to deceive. It also appears that they were relied upon by the Bank in extending credit to the bankrupt. Furthermore, this court concludes that even if the Bank's witnesses are given only partial credence, the evidence as to whether there was reliance by the Bank and an intent to deceive on the part of the bankrupt is at the least in "substantial equilibrium". Upon such a state of facts the discharge must be denied unless the bankrupt meets his burden of proving either no reliance by

the Bank, see Morris Plan Industrial Bank of New York v. Parker, 79 U.S. App.D.C. 164, 143 F.2d 665 (1944); In re Savarese, 56 F.Supp. 927 (E.D.N.Y. 1944), or that he had no intent to deceive the Bank, see In re Barbiere, 97 F.Supp. 86 (E.D.Pa.1951).

While this court would be justified in denying the discharge without further proceedings, we feel that the bankrupt should be afforded the opportunity either to produce any evidence he might possess as to the Bank's reliance upon the financial statements, or to explain the apparent falsity of the financial statements, or to disclaim any intent to deceive the Bank by means of the financial statements.

Accordingly, the petition for review is granted, and the order of the referee is reversed with directions that he hold further hearings and make new findings with the burden of proof upon the bankrupt.

The Clerk is directed to send a copy of this opinion and judgment to counsel of record and to the Referee.