Orlando DE ARAGON, as Trustee of Central San Vicente, Inc., a debtor, Plaintiff,

New San Vicente, Inc., Plaintiff-Intervenor

v.

The CHASE MANHATTAN BANK, San Juan, Puerto Rico Branch, and Jorge Gonzalez, Defendants.

Civ. No. 64-63.

United States District Court, D. Puerto Rico.

Jan. 22, 1971.

Orlando Antonsanti, San Juan, P. R., for plaintiff.

Gabriel Guerra-Mondragon, San Juan, P. R., for plaintiff-intervenor.

Richard González, Fiddler & González, San Juan, P. R., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

FERNANDEZ-BADILLO, District Judge.

This is an action brought by the Chapter X Trustee of Central San Vi-

cente, Inc.,[1] a local sugar mill, to recover from the Puerto Rican Branch of The Chase Manhattan Bank[1] payments totalling $250,000 as preferences voidable under Section 60 of the Bankruptcy Act or as fraudulent transfers under Section 67, sub. d of the Act. Following reorganization, San Vicente's successor, New San Vicente, Inc.,[1] was permitted to intervene and assert an identical claim. Both claims were categorically denied by Chase.

After a four day trial, the parties submitted briefs and upon consideration of all the evidence adduced at the trial, including numerous exhibits and the applicable law and authorities, the Court makes the following findings of fact and conclusions of law.

### Findings of Fact

Jorge Gonzalez Hernandez was principal stockholder and chief executive of San Vicente, which operated a sugar mill and warehouse in Vega Baja. Gonzalez also cultivated sugar cane on lands owned in his own name and in the names of two other companies, Compania Agricola Mendez, Inc. and Central Agricultural Co., Inc. All of this cane was sent to the mill for grinding and the sugar produced therefrom was put in the warehouse. Thus, Gonzalez and his land companies were colonos of the mill.

Chase financed the cultivation of the cane grown by Gonzalez and his companies under recorded *refaccion* or crop loan contracts whereby Chase held crop liens on all the cane produced.[2] For the 1961/62 crop season, Chase loaned Gonzalez a total of $274,000, Agricola Mendez a total of $69,000 and Central Agricultural $20,000, all secured by such crop liens. During that season, Gonzalez and his companies sent to the mill 1,409,720 quintals of cane, from which a total of 128,932.72 quintals of sugar were produced and placed in San Vicente's warehouse. The share belonging to Gonzalez and his companies, as colonos, was 82,-

1. Central San Vicente, Inc. and New San Vicente, Inc. shall hereinafter be referred to as "San Vincente." The Chase Manhattan Bank shall be referred to as "Chase".

2. See: 5 L.P.R.A. §§ 164, 169, 170.

331.85 quintals of sugar (about 4,100 tons). In the early part of 1962, these colono sugars were sold and on account thereof, San Vicente received payments aggregating at least $209,000, which were used by San Vicente in the operations of the mill.

Besides making these crop loans, Chase also made secured loans to San Vicente to finance the operations of the mill and warehouse. The funds thus borrowed were used for advances to other colonos and to meet dead season expenses and were secured by mortgages on San Vicente's real estate and plant and by pledge of colono notes. A total of $1,111,120.24 was loaned by Chase during the 1961/62 crop season. After that amount had been repaid and starting on May 3, 1962, Chase began making similar loans for the 1962/63 season; by July 19, 1962, these advances reached a total of $729,000. They were evidenced by collateral loan notes which provided that the collateral (consisting of second and third mortgages totalling $1,320,000 and about $673,000 of colono notes) would secure the notes and any other liability or indebtedness of San Vicente to Chase "due or not due, present or future, direct or indirect".

In March, 1962, Gonzalez applied to the Government Development Bank for a $450,000 loan to San Vicente, to be secured by an increase in the first mortgage held by that Bank. The stated purpose of the loan was to enable San Vicente to pay for repairs and improvements to the machinery and equipment of the mill and the proceeds of the loan were to be used to pay obligations of the mill to creditors who had supplied equipment during the 1961 dead season. The mortgage loan was not granted until June 21, 1962 and the net amount loaned was $417,000. Prior to receipt of these funds, the mill used other monies to pay equipment suppliers, including the proceeds of the sales of the colono sugars of Gonzalez and his companies.

As was customary, Chase looked to Gonzalez and his companies to clean up their crop loans by the end of the 1962 grinding season before making new loans for the next season. After San Vicente obtained the mortgage loan in June, 1962, the mill made three payments to Chase for account of Gonzalez and Central Agricultural, as part payment for liquidations of their colono sugars. Two of the payments totalling $230,000 were made for account of Gonzalez; the other payment of $20,000 was made for account of Central Agricultural. Thereafter, Chase continued to make dead season loans to San Vicente up to July 19, 1962, at which time Chase first learned that San Vicente was in financial difficulties that eventually lead to the filing of the Chapter X petition.

It was then discovered that San Vicente had issued about $1,000,000 worth of receipts for mill sugars in excess of the amount in its warehouse. The 7,741 tons actually there were claimed by other colonos and purchasers from colonos and by outside depositors. The conflicting claims were ultimately determined in an interpleader suit in the Bayamon Court. Prior thereto, Chase made claim to the colono sugars of Gonzalez and his companies sold to Olavarria Sugar Corp. which had been pignorated with Banco Credito y Ahorro Ponceno. The claims were settled by Banco Credito paying Chase the sum of $44,000 still due on the crop loans to Gonzalez and the additional sum of $69,000 still due on the crop loans to Agricola Mendez and by Chase assigning its crop liens to Banco Credito. Banco Credito was able to recoup these payments out of the sugar proceeds distributed by the Bayamon Court.

### Conclusions of Law

Chase's basic defense to plaintiffs' claims in this action is that the cane grown on the lands of Gonzalez and his companies that was subject to Chase's crop liens was shipped to the mill and converted into sugar and that under the law of Puerto Rico, the mill became liable to Chase for the value of the 4,100 tons of colono sugars derived from that cane. Reliance is placed on Section 172

of Title 5 of the Laws of Puerto Rico Annotated, which provides that third parties are bound by crop loan contracts. The language of § 172 is unambiguous:

"§ 172.—*Third parties bound; transfer of interests*

Such entries and marginal notes of entries as may be made in the 'Registry of contracts for agricultural purposes' shall be to the prejudice of and binding upon third parties, from and after the filing of the respective documents. If, while the lien is in force, the products encumbered are disposed of by the debtor to a third party, the creditor making the advances for agricultural purposes shall have the right to obtain from the latter the delivery of the said products or the proceeds of the sale thereof, in case the return of the products is impossible."

■ It seems clear that it was the intent of the statute that Chase's crop loans would be binding on San Vicente as the mill which received the cane and manufactured the sugar and that such liability would continue until the loans were paid. It seems equally clear that the same liability was imposed by § 172 on purchasers and pledgees of the colono sugars.

■ The mill took the colonos' cane with full knowledge that Chase had loaned the money to produce the harvest and the mill was chargeable with knowledge that under § 172, Chase had the right to obtain from the mill delivery of the colonos' share of sugars produced therefrom or the proceeds of the sale of such sugars. Failure of the mill to turn over the sugars or their proceeds did not relieve the mill of responsibility; the mill still remained liable to Chase for the value of the sugars.

■ Although sugar cane and raw sugars are fungible, they are nevertheless identifiable and dealers who purchase sugars and banks who finance them are aware that the law of Puerto Rico protects crop lenders. Until payment is made to the crop lender, he can still look to colono sugars in the hands of a purchaser or pledgee to satisfy the crop liens.

■ It is obvious that in a situation like the one in the case at Bar the liability imposed by § 172 extends to the mill and also to the purchasers and pledgees of the colono sugars, and despite the fact that the mill had parted with the sugars and had diverted the proceeds of sale, the "third party" liability of the mill remained. The circumstance that Chase could follow the sugars in the hands of other "third parties" could not relieve the mill of its liability, which did not depend on the continued possession of the sugars or their proceeds. Chase could enforce that liability against the mill *in personam* and Chase remained a creditor of the mill to the extent of the value of the sugars.

Chase maintains that the mill's liability became a secured indebtedness from its inception since Chase took security in the form of mortgages and colono notes in connection with its dead season loans to the mill, which the mill had agreed Chase could hold for any other liability of the mill.

From the legends on the checks which the mill gave to Chase, it is clear that the disputed payments to Chase were made for account of Gonzalez and his land company in liquidation of their colono sugars of the 1962 crop. The receipt of these payments had the double effect of satisfying in part the colonos' contractual liability for their crop loans and also satisfying the mill's statutory liability for the sugars of these colonos.

■ Having reached the conclusion that the disputed payments could be retained by Chase to satisfy, in part, the mill's "third party" liability, plaintiffs' contention that the payments were fraudulent transfers because they were not made for a fair consideration must be rejected. Section 67, sub. d(1) of the Bankruptcy Act, relied on by plaintiffs, defines "fair consideration" as follows:

"(e) consideration given for the property or obligation of a debtor is 'fair' (1) when, in good faith, in exchange

and as a fair equivalent therefor, property is transferred *or an antecedent debt is satisfied,* or (2) when such property or obligation is received in good faith to secure a present advance *or antecedent debt* in an amount not disproportionately small as compared with the value of the property or obligation obtained." (Italics added)

■ Looking at the plain language of the statute, there can be no doubt that the payment of an antecedent debt (whether secured or unsecured) represents a fair consideration. Cohen v. Sutherland, 257 F.2d 737, 742 (2nd Cir. 1958); Gilmer v. Woodson, 332 F.2d 541, 547 (4th Cir. 1964); Mayo v. Pioneer Bank & Trust Company, 270 F.2d 823 (5th Cir. 1959), cert. den. 362 U.S. 962, 80 S.Ct. 878, 4 L.Ed.2d 877; Collier's on Bankruptcy, Vol. 4, ¶ 67.33, p. 503; Remington on Bankruptcy, Vol. 4, § 1654, p. 183.

The good faith of Chase in these transactions can scarcely be questioned. While awaiting payment of the crop loans made to Gonzalez and his companies out of the liquidations of their sugars, Chase continued to furnish dead season and colono financing to the mill and even after Chase received the disputed payments, Chase continued to loan money to the mill so that by the time the mill's insolvency came to light after July 19, 1962, the mill's borrowings from Chase had reached a total of $729,000.

Although plaintiffs did not press their claim that the questioned payments were "preferences", that claim is also untenable when weighed against the undisputed facts of this case. The elements of a voidable preference under Section 60 of the Bankruptcy Act are well stated in the case of Moran Bros., Inc. v. Yinger, 323 F.2d 699 (10th Cir. 1963), where the Court said at p. 701:

"The essential elements of a voidable preference under § 60 are as follows: (1) There must be a transfer of property owned by the debtor; (2) to or for the benefit of a creditor; (3) for or on account of an antecedent debt; (4) made or suffered by the debtor while insolvent; (5) within four months of bankruptcy; (6) the effect of which will enable the creditor to obtain a greater percentage of his debt than other creditors of the same class; and (7) the creditor receiving the transfer or to be benefited thereby, or his agent, must have reasonable cause at the time the transfer is made to believe that the debtor is insolvent."

In the instant case, two important elements are lacking because the payments made by the mill to Chase were not for an antecedent unsecured debt and the Court is satisfied that at the time Chase received the payments Chase had no reasonable cause to believe that the mill was insolvent.

■ There is ample authority for the proposition that a payment on account of a secured debt does not constitute a preference. Johnson v. Root Mfg. Co., 241 U.S. 160, 36 S.Ct. 520, 60 L.Ed. 934 (1916); Irving Trust Co. v. Bank of America Nat. Assn., 68 F.2d 887 (2nd Cir. 1934), cert. den. 292 U.S. 628, 54 S.Ct. 630, 78 L.Ed. 1482; Bertram v. Citizens National Bank, 283 F.2d 783 (6th Cir. 1960); Azar v. Morgan, 301 F.2d 78 (5th Cir. 1962); Collier's on Bankruptcy, Vol. 3, ¶ 60.22, p. 868; Remington on Bankruptcy, Vol. 4, § 1702.3, p. 321.

■ The Court being satisfied that Chase acted in good faith, there is no basis for holding that Chase knowingly received a "preference". Therefore, the cause of action for preference must also be rejected. See: Grant v. First National Bank, 97 U.S. 80, 24 L.Ed. 971 (1877); Lang v. First National Bank of Houston, 215 F.2d 118 (5th Cir. 1954); Moran Bros. Inc. v. Yinger, *supra,* 323 F.2d at pp. 701–702; Shaw v. U. S. Rubber Co., 361 F.2d 679 (5th Cir. 1966); International Minerals & Chem. Corp. v. Moore, 361 F.2d 849 (5th Cir. 1966).

The complaints of the plaintiffs and the intervenor should both be dismissed.