In the Matter of Sterling R. DECKER and Sterling R. Decker & Mary Jane Decker, Partners, t/a Berkeley Community Builders, Bankrupt.

Nos. 706, 707.

United States District Court
W. D. Virginia,
Charlottesville Division.

Jan. 6, 1969.

B. B. Woodson and Robert M. Musselman, Charlottesville, Va., for Bankrupt.

Carl E. Hennrich, Charlottesville, Va., for George Gilmer.

Philip Hickson, Lynchburg, Va., Referee in Bankruptcy.

### OPINION and JUDGMENT

DALTON, Chief Judge.

The questions presented in this proceeding arise out of petitions for review of two orders of the referee in bankruptcy concerning Sterling R. Decker and Mary Jane Decker, his wife and partner, trading as Berkeley Community Builders.

The first order dated September 11, 1968, reaffirms the referee's conclusions contained in a previous order of June 26, 1967, which had been reconsidered in the light of additional pleadings and oral argument. The order of September 11, 1968, concerns issues upon remand from a decision of the Court of Appeals for the Fourth Circuit, Gilmer v. Woodson, 332 F.2d 541 (4th Cir. 1964), which upheld the validity of a deed of trust, dated March 27, 1961, securing a bond of the same date in the amount of $260,-000. Upon remand the trustee in bankruptcy, B. B. Woodson, renewed his attacks on the validity of this deed of trust under the provisions of sections 67(d) and 70 of the Bankruptcy Act, 11 U.S.C. §§ 107(d) and 110. The referee reaffirmed the validity of this deed of trust by the order dated September 11, 1968, and the trustee now petitions for review of such order.

The other order herein reviewed is dated August 23, 1968, and deals with the validity, under section 67(d) (2) of the Bankruptcy Act, of two supplemental deeds of trust executed by the bankrupt as additional security for the $260,000 bond mentioned above. The or-

der of August 23, 1967, held these two supplemental deeds to be fraudulent transfers, and from this order George Gilmer, a creditor of the bankrupt, petitions this court for review.

The facts, as gleaned from the voluminous records of these proceedings and as found by the referees, the Court of Appeals for the Fourth Circuit in Gilmer v. Woodson, 332 F.2d 541 (4th Cir. 1964), and the Supreme Court of Appeals of Virginia in Woodson v. Gilmer, 205 Va. 487, 137 S.E.2d 891 (1964), are as follows.

In December, 1956, Sterling R. Decker and Charles Hurt purchased a tract of 110.68 acres of land in Albemarle County, Virginia, for the purpose of developing and selling the land as residential lots. On April 26, 1957, Hurt conveyed a two-sixths interest in the property to George Gilmer, Sr., and George Gilmer, Jr., pursuant to an agreement executed the same day by the Gilmers, Decker and Hurt. A few days thereafter Hurt conveyed his remaining one-sixth interest in the property to David J. Wood, Jr., and Joseph M. Wood, II. By an addendum to the April 26th agreement, signed by the Gilmers, the Woods, and Decker, the parties agreed that the two Woods were accepted as partners by the other parties in place of Hurt.

The agreement of April 26, 1957, provided that Decker would manage the development of the subdivision of the 110.-68 acres of land, known as "Berkeley." Assessments for roads and other improvements were to be made by Decker and were to be borne by all the partners. Decker was given the option to purchase the one-half interest of his co-owners in the first fifty-three lots at the rate of $1,000 per lot, and in additional lots at the rate of $1,250 per lot, provided that he purchase at least three lots per month beginning in 1958. Questions of policy were to be decided by vote of the owners, who would vote according to their respective shares of the property. Although there is no provision in the agreement expressly dealing with the manner in which profits were to be shared, it appears that Decker was to derive his own profits, if any, from the resale of lots after he had exercised his option in purchasing the outstanding interests of the co-owners. This agreement, together with the subsequent business transactions and conduct of the parties, was sufficient to convince the Supreme Court of Appeals of Virginia that a partnership existed between Decker, the Gilmers and the Woods, "to pool their land and money, and in some instances talent and labor, for the improvement of the property." Woodson v. Gilmer, 205 Va. at 493, 137 S.E.2d at 895.

In 1957 Decker began the development of the Berkeley property in partnership with his wife under the name of Berkeley Community Builders. In the development of Berkeley subdivision, entailing the purchase of his partners' outstanding interests in the lots, the furnishing of utilities, the resale of the lots and building houses thereon for the ultimate purchasers, Decker required large amounts of capital which he could not provide. He therefore arranged with Mr. Adams, an officer at the Peoples National Bank (now the Virginia National Bank), to obtain funds from the bank upon the personal credit of George Gilmer, Sr., who was a close friend of Decker and was his attorney throughout the period here discussed. Under this arrangement, Decker would secure the necessary funds by executing unsecured promissory notes, obtaining the endorsement of Gilmer thereon for a fee.

This credit arrangement with Gilmer and the bank continued for approximately two years, during which time it clearly appeared that when Decker devoted his time and attention to the Berkeley project it could be made a highly profitable operation. A large number of lots, said to be ninety, were sold by Decker prior to the early months of 1961. However, Decker began to neglect the Berkeley project, apparently because of involvement in unrelated ventures which attracted his interest and, as it turned

out, depleted his resources. Without the knowledge or consent of Gilmer or the bank, Decker had been diverting funds borrowed through Gilmer's credit to his other business ventures. Several of Decker's creditors began pressing him for payment, and on several occasions the Deckers' checking account was overdrawn.

Both Mr. Adams at the bank and Gilmer became aware of the unsatisfactory condition of Decker's financial affairs in early 1961. As of March 27, 1961, the bank was holding promissory notes made by Decker and endorsed by Gilmer totaling $249,199.31. In view of this heavy financing of Decker, both Gilmer and Adams decided that some sort of control over Decker's financial affairs would be necessary in order to keep track of his activities and get him to concentrate his efforts on the Berkeley project. In the discussions between Gilmer and Adams in the weeks preceding March 27, 1961, it was suggested by Adams, and agreed to by Gilmer, that Decker should put up some security for his notes with the bank.

On March 27, 1961, Decker and his wife executed a deed of trust, covering virtually all of their real estate, together with a bond payable to bearer on demand in the amount of $260,000, with interest at the rate of 6%, secured by the deed of trust. The bond and the deed of trust were held by the bank as collateral security for the payment of the promissory notes executed by Decker and endorsed by Gilmer. The testimony of Adams, Gilmer and Decker concerning this transaction is not in conflict. Gilmer explained that the purpose of the deed of trust was, first, to secure the indebtedness, second, to have a base upon which Decker could continue to be financed, and third, to restrict Decker's activities to Berkeley.

Contemporaneously with this plan, an "escrow" account, under the control of Gilmer, and a "reserve" account under the control of the bank and Gilmer, were set up to handle the income and expenses attributable to the Berkeley project. Proceeds from the sales of lots by Decker were to be deposited in the "reserve" account. With the approval of Gilmer, Adams would draw checks on the "reserve" account for payment of the various expenses of the Berkeley project, for payment of Decker's personal obligations, and for purchases by Decker of the outstanding interest of the other partners in Berkeley lots. Funds deposited in the "escrow" account would arise from the proceeds of the construction of houses by Decker for purchasers of Berkeley lots.

The $260,000 bond was drawn in an amount in excess of the then aggregate amount of Decker's notes endorsed by Gilmer to enable the bank to subsequently lend more money to Decker and bring these loans under the security thus afforded. However, there was no definite understanding among the bank, Gilmer and Decker as to the extent of future credit to be afforded Decker, other than that the amount of Decker's debt would first be reduced.

In the spring and summer of 1961, the Berkeley project took an upturn under Decker's management. According to Decker's testimony, approximately thirty lots were sold and the construction of houses on several of these lots was undertaken. However, it does not appear that these sales were primarily due to the new financing plan. Decker testified that the sales occurred because it was the spring of the year, the usual time for such sales. The chief contribution of the bank and Gilmer seems to have been the bank's extension of credit to purchasers under the security of the blanket deed of trust, Gilmer's management of the reserve and escrow accounts, and deferment of collection of the overdue notes of the bankrupt. As stated by the referee:

> This deferment was undoubtedly due to the fact that through the new financing plan the services of Decker were retained to promote and conduct the continued development of proper-

ties in the Berkeley project. Decker alone sold the lots and sold the contracts for construction of dwellings. These sales by Decker introduced new lines of credit offered by the purchasers. This permitted a liquidation of Berkeley lots and the prospect of construction profits without either the bank or Gilmer assuming any additional risk from Decker's venture.

Between June and October, funds from the sales of lots, totaling $76,397.-37, were deposited in the reserve account. During the same period checks totaling a like amount were drawn by the bank, under Gilmer's direction, of which approximately $21,000 went toward reducing the indebtedness of Decker and his wife, about $16,000 went to the two Gilmers and the two Woods in payment for their outstanding one-half interest in various Berkeley lots, and the balance went to Decker's other creditors. Proceeds from construction contracts were deposited in the escrow account, and the surplus after payment of construction costs went, at least in part, to Gilmer in payment of some of Decker's notes payable to Gilmer for his legal services.

On four occasions subsequent to March 27, 1961, Decker and his wife executed supplemental deeds of trust conveying the one-half interest in Berkeley lots which Decker had acquired from the Gilmers and the Woods after March 27, 1961. These supplemental deeds of trust were given solely as additional security for the $260,000 demand bearer bond.

The first two of these supplemental deeds of trust, dated June 3, 1961, and July 26, 1961, conveying in trust a one-half interest in twenty-seven lots, are the subject of the referee's order of August 23, 1968.

The last two deeds of trust were similar to the first two, and were the subject of an appeal to the Court of Appeals for the Fourth Circuit in Gilmer v. Woodson, supra. In that decision the court held that the two supplemental deeds of trust were voidable preferences under section 60(a) (1) of the Bankruptcy Act, 11 U.S.C. § 96(a) (1), having been given within four months of bankruptcy as additional security for an antecedent debt. This ruling has no relevance to the question of the two deeds of trust herein considered.

In spite of the spring and summer sales, Decker's creditors continued to hound him, and those who weren't paid were no longer satisfied with promises. On November 15, 1961, the bank found it necessary to demand payment of all the Gilmer-endorsed notes either made or endorsed by Decker. On that date all these notes were paid by Gilmer, to whom they were then assigned by the bank. The notes on which Decker and his wife were the makers amounted to $247,275.00.

On December 11, 1961, Gilmer and others filed a petition for the involuntary adjudication of Decker and the Berkeley Community Builders partnership as bankrupts. Shortly thereafter Decker filed a bill of complaint in the state court, alleging that a partnership existed between him and the defendants, the Gilmers and the Woods, and praying that the court direct the winding up of the partnership affairs. The question of whether a partnership existed was ultimately decided by the Supreme Court of Appeals of Virginia in Woodson v. Gilmer, supra.

Decker was adjudicated a bankrupt on January 12, 1962. By his order of July 3, 1962, the referee found as facts that as of March 27, 1961, the bankrupts were short of working capital and insolvent. The referee further found that the blanket deed of trust did not materially curtail Decker's business, that the deed of trust was not executed with bankruptcy in mind, that it was not executed in order to hinder, delay or defraud creditors, and that the antecedent debts which the deed of trust was given to secure were "fair consideration" within the meaning of sections 67(d) (1) (e) and 67(d) (2) (a), (b) and (c) of the Bankruptcy Act. These findings

were affirmed by the Fourth Circuit Court of Appeals in Gilmer v. Woodson, supra, and the case was remanded to this court for further proceedings.

### Order of September 11, 1968

The first question presented for determination by this court concerns, once again, the validity of the March 27, 1961, blanket deed of trust. The trustee contends that this deed of trust is void in whole or in part on several grounds: (1) The evidence presented at hearings both prior to and subsequent to the remand of this case clearly establishes that contrary to the holding of the Court of Appeals, the blanket deed of trust was not given in good faith and for fair consideration, and that it was given with actual intent to hinder, delay and defraud creditors within the meaning of section 67(d) of the Bankruptcy Act; (2) The deed of trust is voidable under section 70(e) (1) of the Bankruptcy Act and § 55–80 of the Virginia Code (1950) as a fraudulent conveyance under the law of Virginia; (3) The description of the land sought to be conveyed by the fourth paragraph of the deed of trust is vague, uncertain, and ambiguous, and, as a matter of law, inadequate to transfer any interest in the land therein described; (4) This fourth paragraph of the deed of trust is void by reason of section 25(2) (b) of the Uniform Partnership Act, Va.Code § 50–25(2) (b) (1950), since it is an attempted conveyance by a partner of his interest in specific partnership property; and (5) The deed of trust is voidable under § 70(e) of the Bankruptcy Act in that it was obtained by Gilmer through abuse of the attorney-client relationship then existing between Gilmer and Decker.

■■ As to the first contention of the trustee, the referee found that the evidence introduced since the remand of this case tends only to amplify previous testimony. Both this court and the Court of Appeals found substantial support for the findings of the previous referee. The referee and this court are mindful of the statement of the Fourth Circuit Court of Appeals that where a referee's findings are based on conflicting evidence, the reviewing court should not disturb them unless there is "most cogent evidence of mistake and miscarriage of justice." Gilmer v. Woodson, supra, 332 F.2d at 546. Accordingly, and in view of the holding of the Court of Appeals, this court concludes that the March 27, 1961, blanket deed of trust was given for fair consideration and without actual intent to hinder, delay or defraud creditors.

The trustee next relies on section 70(e) (1) of the Bankruptcy Act in asserting that the deed of trust is fraudulent as to creditors under the Virginia fraudulent conveyance statute, Va.Code § 55–80 (1950).

The Virginia statute, like section 67(d) (2) (d), requires an intent on the part of the debtor to delay, hinder or defraud creditors. One difference in the application of the two statutes, if indeed one exists, is the proof necessary to infer a fraudulent intent. Section 67(d) (2) (d) requires proof of "actual intent as distinguished from intent presumed in law," while under Va.Code § 55–80, a court may indulge in presumptions of fraud based upon suspicious circumstances, or "badges of fraud," attending the transaction. See 4 Collier on Bankruptcy ¶ 67.37 p. 530 (1967); 9 Michie's Jurisprudence, Fraudulent and Voluntary Conveyances, § 15 (1950). A further distinction is that the Virginia statute reads that it "shall not affect the title of a purchaser for valuable consideration, unless it appears that he had notice of the fraudulent intent of his immediate grantor or of the fraud rendering void the title of such grantor."

■ The Virginia courts require that circumstantial evidence of fraud be "clear and convincing, and such as to satisfy the conscience of the chancellor, who should be cautious not to lend too ready an ear to the charge." Hutcheson v. Savings Bank, 129 Va. 281, 289, 105 S.E. 677, 680 (1921); Redwood v. Rog-

ers, 105 Va. 155, 53 S.E. 6 (1906). The evidence of fraudulent intent on the part of Decker was insufficient to convince the referee of any such actual intent, and it is doubtful that a Virginia court would be more receptive to the charge. But even assuming that the inference of fraudulent intent on the part of Decker would be justified, attributing a like design to Gilmer is not. Gilmer testified that he had little or no knowledge of Decker's precarious financial condition at the time the deed of trust was executed, and Decker admitted that he was less than candid with Gilmer regarding the extent of his indebtedness at that time. It must be concluded that the trustee's burden of proof has not been met in this respect.

■ The trustee's contention that the description of the land sought to be conveyed by the fourth paragraph[1] of the March 27, 1961, deed of trust is inadequate as a matter of law was properly rejected by the referee. There can be no doubt that the parties understood what property it was intended to convey. Deeds containing no descriptions have been held valid as between the parties to the conveyance. Mundy v. Vawter, 44 Va. (3 Grat.) 518 (1847). And even a stranger to the deed of trust, by following the references in the deed, could locate the property to his satisfaction. Under Virginia law, no more is required. See Smith v. Bailey, 141 Va. 757, 127 S.E. 89 (1925).

The trustee's fourth argument presents novel questions under Virginia's Uniform Partnership Act, Va.Code Ann. § 50–1 et seq. In essence, the argument is that some of the land which the fourth paragraph of the blanket deed of trust attempts to convey is partnership property; that Va.Code Ann. § 50–25(2) (b) forbids the assignment of a partner's interest in specific partnership property except in connection with the assignment of the rights of all partners in the same property; that Decker's partners did not join in the deed of trust; and that, therefore, the deed of trust, insofar as it attempts to assign partnership property, is void. Gilmer contests not only this conclusion, but the premises as well.

Whether the 110.68 acres of land referred to in the fourth paragraph constitute, at least in part, partnership assets, is a question which is all but foreclosed by the decision of the Supreme Court of Appeals of Virginia in Woodson v. Gilmer, supra. Gilmer reluctantly concedes as much.

■ It is likewise clear that the fourth paragraph of the deed of trust purports to convey an undivided one-half interest in this land, which at the time of the conveyance was in part partnership property and in part the individual property of Decker. The partnership agreement provided that Decker could purchase one-half interests in specific lots from the other partners. Decker acquired these lots as his individual property by means of several deeds, thirteen of which are referred to in the fourth paragraph of the deed of trust, executed by the Gilmers and the Woods. Nothing in the Uniform Partnership Act

1. "FOURTH: All interest acquired by Sterling R. Decker in 110.68 in Albemarle County, Virginia, fronting on the west side of Route 29, north of Charlottesville, and the south side of State Route 631, except parts or interest conveyed all by deeds recorded before this date and the dedication of streets and easements for electric and telephone lines, and water and sewer pipes as shown on plats of record or in deeds of record. This includes a one-half interest in this land as conveyed to Sterling R. Decker by W. Hallam Tuck and wife by deed dated December 24, 1956, recorded in D. B. 330 p. 244, and a part of this is subject to deed of trust from Sterling R. Decker and others conveyed to Magruder Dent, Jr., and George Gilmer, Trustees, dated January 17, 1957, and recorded in D. B. 330 p. 245 reduced by payments of $15,087.50. The other half interest of parts has been conveyed to Sterling R. Decker by David J. Wood and others, by deeds of record in * * *. Some of these lots are subject to deeds of trust."

was intended to prevent partners from transferring partnership property among themselves, assuming all the partners consent to such conveyances. Goldberg v. Goldberg, 375 Pa. 78, 99 A. 2d 474, 39 A.L.R.2d 1359 (1953); Becker v. Hercules Foundries, Inc., 263 App. Div. 991, 33 N.Y.S.2d 367 (1942), app. denied 264 App.Div. 721, 34 N.Y.S.2d 524. To the extent that the land was Decker's individual property, the deed of trust cannot be assailed by the trustee as an ineffective conveyance.

■ To the extent the land was partnership property, Va.Code Ann. § 50–25(2) (b) must be considered. Section 50–25(2) (b) provides: "A partner's right in specific partnership property is not assignable except in connection with the assignment of the rights of all the partners in the same property." It is a basic rule of statutory construction that this section cannot be read alone, but must be construed with reference to other sections of the Uniform Partnership Act. See Stilgenbaur v. United States, 115 F.2d 283 (9th Cir. 1940). While no Virginia decision has interpreted this section of the partnership act, the act has been interpreted in many of the more than thirty states which have adopted the Uniform Act. See 29 A.L. R.2d 1365. Va.Code Ann. § 50–4(4) requires that the act be construed so as to effect its general purpose to make uniform the law of those states which enact it.

■ Section 24 of the partnership act, Va.Code Ann. § 50–24, provides that a partner's property rights are (1) his rights in specific partnership property, (2) his interest in the partnership, and (3) his right to participate in the management. Section 25(1) of the act states that a partner is co-owner with his partners of specific partnership property holding as a tenant in partnership. The incidents of a partner's tenancy are such that the partner, subject to any contrary agreement, has an equal right "to possess specific partnership property for partnership purposes; but he has no right to possess such property

for any other purpose without the consent of his partners." Va.Code Ann. § 50–25(2) (a). Moreover, a partner's right in specific partnership property cannot be assigned by the partner, nor is it subject to attachment or execution, without the consent of all the partners. Va.Code Ann. § 50–25(2) (b) and (c). The consent of all the partners, either expressed or implied, is the source and limit of a partner's right to deal with partnership property for whatever purpose.

■ The reasons for this are obvious in view of the nature of a partner's right in specific partnership property— his right to possess and use the property for a partnership purpose. If the law recognized the right of a partner to assign his right in particular partnership property to a third person, the assignee would pro tanto become a partner, since he would have the right to possess the property for a partnership purposes irrespective of the desires of the other partners. But partnership is a voluntary relation, and the other partners cannot have a new partner thrust upon them without their consent. See Commissioners Note, 7 Uniform Laws Anno. Partnership p. 145 (1949).

■ Sections 9 and 10 of the Partnership Act, Va.Code Ann. §§ 50–9, 10, spell out the extent of a partner's authority to act for and bind the partnership in the absence of any express authority. However, implicit in these rules is the fundamental rule of agency law, that where the partner's act is authorized, as where the other partners consent to the act, the partnership is bound thereby. In determining whether such consent exists, the rules of agency law apply. Consent may arise by means of an express or implied agreement, and may be inferred from the conduct of the partners either before or after the act of the partner. See 1 Rowley on Partnerships § 9.1–D(3) (1960). Where this consent of all the partners exists, a partner may assign his interest in specific partnership property to his other partner, or partners. Goldberg v. Goldberg,

375 Pa. 78, 99 A.2d 474, 39 A.L.R.2d 1359 (1959), Williams v. Dovell, 202 Md. 351, 96 A.2d 484 (1953); or to a third party either for his own or for partnership purposes, see Liberty Savings Bank v. Campbell, 75 Va. 534 (1881); Commissioner of Internal Revenue v. Whitney, 169 F.2d 562 (2nd Cir. 1948); see also Becker v. Hercules Foundries, Inc., supra, 263 App.Div. 991, 33 N.Y.S.2d 367 (1942). It follows that where the assignment by a partner of his interest in specific partnership property is not authorized, the assignment is ineffective as such by virtue of section 25(b) (2). Gold Fork Lumber Co. v. Sweany & Smith Co., 35 Idaho 226, 205 P. 554 (1922); Windom National Bank v. Klein, 191 Minn. 447, 254 N.W. 602 (1934); Shapiro v. United States, 83 F. Supp. 375 (D.C.Minn.1949) aff'd, 178 F.2d 459 (8th Cir. 1949).

█ The question in this case is whether Decker's assignment of his interest in specific partnership property was authorized. The debts for which the deed of trust was given as security were Decker's individual debts, and hence the assignment by Decker cannot be said to be for a partnership purpose, nor is it so contended by Gilmer. Rather, Gilmer argues that since no partner objected to the deed of trust, their consent, and hence Decker's authority, may be inferred from their silence. The difficulty with this argument is that the partner's lack of objection can be interpreted in several ways. It could mean that Decker had the authority to assign as security for his personal debts the interests of all the parties in the partnership property. This was hardly the case, since there is nothing in the record to indicate that the partnership intended to assume the debts of Decker. Also, it would mean that Gilmer through his partner and agent, Decker, was assigning his interest in the partnership property as security for debts which ultimately were owed to Gilmer. Another possibility is that Decker had the authority to convert his interest in partnership property into his own separate estate merely by executing a conveyance to a third party. While we have found nothing in the law of Virginia which prevents such a result, we have found nothing in the record which would permit such a conclusion. The partnership agreement stipulated how Decker could acquire the interest of the other partners in the partnership property. Decker had the option to purchase the outstanding interests of the other partners at specified prices. This option was repeatedly exercised by Decker, and in each case the one-half interest of the other partners in the various lots were conveyed to Decker by deeds executed by the Gilmers and the Woods. This course of conduct does not permit the inference that Decker was authorized to effect a partition of the partnership property by other means. Most likely the silence of the other partners was due to their assumption that the deed of trust, which purported to convey only Decker's interest, in no way affected their rights in the Berkeley property. Even if we assume that the other partners were aware at that time that the land was partnership property, we cannot assume that they were aware of that legal effect of the deed of trust which Gilmer now argues. May it suffice to say that the authority of one partner to act for all will not be implied as to transfers of property not within the scope of firm business, and not for firm purposes. 2 Rowley on Partnerships § 45.3–B(2) (a) (1960).

█ While the trustee's argument that the deed of trust was ineffective as an assignment of Decker's interest in specific partnership property is valid, it does not necessarily follow that the assignment was wholly without effect. Section 26 of the Uniform Partnership Act, Va.Code Ann. § 50–26, provides that a "partner's interest in the partnership is his share of the profits and surplus, and the same is personal property." This partnership interest is assignable irrespective of the consent of the other partners. Va.Code Ann. § 50–27(1).

Hence, the question is whether an ineffective assignment of a partner's interest in specific partnership property may be valid as an assignment of his partnership interest. The trustee relies on Windom National Bank v. Klein, 191 Minn. 447, 254 N.W. 602, 604 (1934), for the proposition that the purpose of section 25(b)(2) is to prevent an assignment of a partner's interest in specific partnership property, and "the only way, therefore, to apply it according to its plain purpose is to nullify all attempts at such assignments. The law is that they were void * * *." However, the court in Windom National Bank v. Klein expressly left open the question here presented. The trustee also quotes an article by William Draper Lewis, a draftsman of the Uniform Partnership Act: "In other words, a partner may assign partnership property for a partnership purpose, but if he attempts to assign the property for his own purposes he makes no assignment at all, because the act destroys the quality of assignability for any but a partnership purpose." Lewis, The Uniform Partnership Act, 24 Yale L.J. 617, 634 (1918).

This statement of the law is correct as far as it goes, but Dean Lewis qualified the statement with his comments in Commissioners Note, 7 Uniform Laws Anno. 147 (1949):

> Of course, an attempted assignment of all the partnership property, void as an assignment of the rights of either of the partners in the property, or an attempted assignment by one partner of his rights in all the partnership property, may be regarded as a valid assignment of the partner's interest in the partnership.

It has been so regarded in the following cases, decided under the Uniform Partnership Act: Shapiro v. United States, 83 F.Supp. 375 (D.C.Minn.) aff'd 178 F.2d 459 (8th Cir. 1949); Valley Springs Holding Corp. v. Carlson, 56 S.D. 163, 227 N.W. 841 (1929).

■ The rationale of the *Shapiro* case is apposite: Where an assignment is not clearly intended to convey a partner's interest in specific partnership property, that is, his right to use partnership property for partnership purposes, but is intended to convey some interest in partnership property, the fact that the parties did not couch their assignment in proper terms does not justify a court's holding their transaction void when there exists evidence establishing a basis upon which the transaction can be consistent and valid. 83 F. Supp. at 377.

■ The fourth paragraph of the March 27, 1961, deed of trust attempted to "grant, bargain, sell and convey * * the following land * * *," namely, "All interest acquired by Sterling R. Decker in 110.68 [acres of land]. * * *" The court can only conclude that Decker intended to convey in trust all the interest in this land which he had the power to convey. The land being partnership property, all the interest in regard to this land which Decker could assign without the consent of all the partners was his interest in the partnership—his right to his share of the profits, and the surplus, if any, after the partnership affairs have been settled. Va.Code Ann. § 50-26 (1950). This result is consistent with the subsequent dealings among the bank, Gilmer and Decker. Decker's share of the partnership profits were to be derived from his resale of lots to purchasers. Under the financial plan devised at the time of the deed of trust was executed, the proceeds of these sales were placed in the "reserve" account, under the control of the bank and Gilmer. The fact that the deed of trust did not purport to assign Decker's partnership interest is not material. The intent of the parties is the controlling factor, and if a person may make an equitable assignment of a chose in action by words alone, a deed signed, sealed, delivered, acknowledged and recorded, should likewise suffice. See Tatum v. Ballard, 94 Va. 370, 26 S.E. 871 (1897); see also 2 Michie's Jurisprudence, Assignments § 19 (1948).

█ Nor can it be said that any purpose of section 25(2) (b) would be frustrated by construing the deed of trust as an assignment of Decker's partnership interest. The primary reasons for the nonassignability of a partner's right in specific partnership property, discussed in the Commissioners Note, 7 Uniform Laws Annotated, Partnership pp. 144–150 (1949), and summarized in Goldberg v. Goldberg, 375 Pa. 78, 99 A. 2d 474, 39 A.L.R.2d 1359 (1953), are that it prevents interference by outsiders in partnership affairs, it protects the rights of other partners and partnership creditors to have partnership assets applied to the firm debts, and that it is often impossible to value a partner's beneficial interest in a particular partnership asset. None of these reasons apply in this instance. Neither Decker's creditors nor the Berkeley partnership's creditors have grounds to complain. Decker himself would not be permitted to repudiate this solemn instrument, and the trustee, standing in his shoes, is in no better position.

█ Our holding that the March 27, 1961, deed of trust was valid as an assignment of Decker's individual and partnership interests in the Berkeley land does not require as to find contrary to the finding of the initial referee that the deed of trust was given for fair consideration within the meaning of § 67(d) of the Bankruptcy Act. Although we are not bound by this finding of the referee, since neither he nor the Fourth Circuit, when it accepted this finding, had the benefit of the holding of the Virginia court that a partnership existed, the fact that the deed of trust conveyed Decker's partnership interest does not make the amount of Decker's debts "* * * disproportionately small as compared with the value of the property * * * obtained." Bankruptcy Act § 67(d) (1) (e) (2), 11 U.S.C. § 107(d) (1) (e) (2). Decker's partnership interest at the time of the execution of the deed of trust, and as revealed by subsequent events, cannot be valued greater than the value of an undivided one-half

interest in the land. The value of Decker's partnership interest depended primarily upon his ability to raise the capital necessary to develop the property and to buy out the interest of the other partners in the land, as well as his success in selling the lots. From the standpoint of the bank and Gilmer, an undivided one-half interest in the land, a more liquid asset, would have been more desirable as security. We hold that the March 27, 1961, deed of trust was given for fair consideration.

█ The trustee's final assault on the March 27, 1961, deed of trust is based upon the attorney-client relationship between Decker and Gilmer at the time the deed of trust was executed. The trustee claims that Gilmer took advantage of his relationship with Decker in securing the benefit of the deed of trust. Although Decker himself has made no such assertion, the trustee relies on section 70(e) of the Bankruptcy Act, 11 U.S.C. § 110(e), and argues that since he represents the creditors of Decker in this proceeding, and since the deed of trust is fraudulent under Virginia law, it is void against the trustee. It seems the trustee's reliance on section 70(e) is misplaced since that section requires that the transfer, in order to be avoided by the trustee, be "fraudulent as against or voidable for any other reason by any creditor of the debtor." Assuming that Gilmer imposed on Decker in securing the deed of trust, no creditor of Decker would have standing to attack the transfer for that fact alone, since if the transfer was fraudulent and at all on this ground, it was fraudulent only as against Decker, or those in privity with him.

█ However, section 70(a) (5), 11 U.S.C. § 110(a) (5), gives the trustee "the title of the bankrupt as of the date of filing of the petition initiating a proceeding under this title * * * to all of the following kinds of property wherever located * * * (5) property, including rights of action, which prior to the filing of the petition he could by any means have transferred * * *; (6)

rights of action arising upon contracts, * * * or the unlawful taking or detention of or injury to his property * * *." It seems that a right of action against an attorney for abuse of the attorney-client relationship would vest in the trustee in bankruptcy of the client under either subsection (5) or (6). See Collier on Bankruptcy, para. 70.28, pp. 405–413 (14th Ed. 1967). However, it is not necessary to pinpoint the source of the trustee's right, since we do not agree that Gilmer abused his influence in his dealings with Decker.

The standard of rectitude of an attorney is ably set forth in a leading Virginia decision, Thomas v. Turner's Adm'r, 87 Va. 1, 12 S.E. 149 (1890), which states:

> * * * all dealings between attorney and client, for the benefit of the former, are not only regarded with jealousy, and closely scrutinized, but they are presumptively invalid, on the ground of constructive fraud, and that presumption can be overcome only by the clearest and most satisfactory evidence. 87 Va. at 12, 12 S.E. at 153.

[The burden is on the attorney to show:]

> * * * not only that no undue influence was used, or advantage taken, but that he gave his client all the information and advice as against himself that was necessary to enable him to act understandingly. He must show, in other words, (1) that the transaction was perfectly fair; (2) that it was entered into by the client freely; and (3) that it was entered into *with such a full understanding of the nature and extent of his rights* as to enable the client to thoroughly comprehend the scope and effect of it. 87 Va. at 13, 12 S.E. at 153.

A review of the record reveals the following facts: Gilmer had been Decker's attorney and close personal friend for several years prior to March, 1961. As of March 27, 1961, Decker owed the bank over $249,000 on his notes endorsed by Gilmer, for which service Gilmer had charged a fee at a rate of 6 percent per annum based on the face amount of the notes. Both this court and the Fourth Circuit Court of Appeals have previously ruled that these endorsement fees were lawful. The idea of the March 27, 1961, deed of trust originated with Mr. Adams of the bank. According to the testimony of Decker, Gilmer and Adams, Decker clearly understood the import of the March 27, 1961, deed of trust and cooperated willingly with Gilmer in its execution. The deed of trust was given for fair consideration. The financial plan arranged by Gilmer, Adams, and Decker, including the March 27, 1961, deed of trust, did not materially curtail Decker's business activities, and in fact Decker has testified that it helped him. Decker has at no time indicated that the deed of trust was detrimental to his interests. Upon Decker's default, Gilmer was required to pay to the bank over $247,000 on Decker's notes secured by the deed of trust.

This court concludes that the March 27, 1961, deed of trust, at the time of its execution, benefited Decker as much or more than it did Gilmer. The deed of trust enabled the bank to postpone its collection of Decker's notes, and permitted Decker to continue his business activities. Although Decker testified in 1964 that he may not have agreed to the deed of trust were it not for his close relationship with Gilmer, his testimony is quite consistent with the idea that Decker was confident at the time that Gilmer, as his attorney and friend, could be trusted to look after Decker's interests. While Gilmer's influence was a factor in Decker's agreeing to the deed of trust, it cannot be concluded from the evidence that Gilmer's influence was *undue*. Hence, the trustee's contention in this regard is unfounded.

### Order of August 23, 1968

Turning to the referee's order of August 23, 1968, the court is asked to reverse the referee's holding that the two supplemental deeds of trust are void as fraudulent conveyances under § 67(d) (2) (a), (b), (c) and (d) of the Bankruptcy Act, 11 U.S.C. § 107(d) (2) (a),

(b), (c) and (d). The first deed of trust, dated June 3, 1961, and recorded June 7, 1961, conveyed in trust a one-half interest in fifteen lots of the Berkeley subdivision. The second deed of trust, dated July 26, 1961, and recorded August 4, 1961, conveyed a one-half interest in an additional twelve lots. Both deeds recite that they are given solely as additional security for the $260,000 demand bearer bond of March 27, 1961.

An essential element of the fraudulent transfers described in subparagraphs (a), (b) and (c) of § 67(d) (2) is that the transfer was made without "fair consideration", a term which, for our purpose, is defined in § 67(d) (1) (e) (2): "When such property or obligation is received in good faith to secure a present advance or antecedent debt in an amount not disproportionately small as compared with the value of the property or obligation obtained." The referee invalidated these two deeds of trust because in his opinion this element of fair consideration was lacking.

This conclusion of the referee is based upon the following additional findings of fact and reasoning. At the time the March 27, 1961, deed of trust was executed neither the bank nor Gilmer indicated that additional capital would be made available to the bankrupts to further their activities in the Berkeley project. At that time the Gilmer-endorsed notes made by Decker totaled $249,199.31. These notes were secured by the $260,000 bond, which in turn was secured by the March 27, 1961, deed of trust. The value of the real estate which this deed of trust attempted to convey was approximately $344,000. The monies deposited in the "reserve" and "escrow" accounts arose from loans by the bank upon interim financing arranged by purchasers of lots upon which dwellings were to be constructed by the

bankrupts. This financing was evidenced solely by the obligations of the purchasers of lots and was secured by vendor's liens pending the completion of construction of the dwellings and execution of the deeds of trust for the permanent financing. No additional capital or credit was extended the bankrupts by either Gilmer or the bank at or subsequent to the execution of either of the two subsequent deeds of trust.[2] On November 15, 1961, when Gilmer was required to pay the bankrupts' notes, his endorsers liability totaled $247,275.

The referee reasons that since "* * the amount of the antecedent primary debts of Decker which [the March 27, 1961] said deed of trust was given to secure was not disproportionately small as compared with the value of the property transferred in trust," Gilmer v. Woodson, supra, 332 F.2d at 545, it follows that the debt was fully secured, and therefore "could not furnish consideration for the two supplemental deeds of trust."

■■■ Accepting the facts substantially as found by the referee, the court cannot agree with his conclusion of law. The question is whether the combined value of the property conveyed by the three deeds of trust, less the value of the property released as security, is disproportionate as compared with the amount of the antecedent debts.

The facts, stated simply, are as follows: The value of the property conveyed as security by the March 27, 1961, deed of trust was, roughly, $344,000. The amount of the primary debts of the bankrupts on that date was approximately $249,000. The court does not consider this disparity, under the facts of this case, to be disproportionate within the meaning of § 67(d) (1) (e) (2). See Epstein v. Goldstein, 107 F.2d 755 (2nd Cir. 1939); Troll v. Chase Nation-

---

2. Although not essential to this decision, the court cannot agree with this conclusion. As noted in Gilmer v. Woodson, 332 F.2d at 547-548, Decker borrowed $16,000 from the bank on Gilmer's endorsement. This loan was made on July 13, 1961, was among the notes which Gilmer paid on November 15, 1961, and would fall under the security of the March 27, 1961, bond and deed of trust and subsequent deeds of trust.

al Bank, 257 F.2d 825 (2nd Cir. 1958); Bianco v. Lay, 313 Mass. 444, 48 N.E.2d 36 (1943). During the spring and summer of 1961 about twenty-four[3] of the Berkeley lots were sold by Decker to purchasers. We may assume for our purposes that the average value of Berkeley lots was about $3,000. Proceeds of these sales, totaling $76,000, were deposited in the "reserve" account, in which fund the bank and Gilmer had a security interest. In other words, $76,000 of property was released from the March 27, 1961, deed of trust and replaced by $76,000 in cash held as security in the reserve account. Of this $76,000, about $20,000 was used to pay the interest and principle owing on the notes of the bankrupts. Another $16,-000 of this fund went toward the purchase of the one-half interest of Decker's partners in additional Berkeley lots. The remaining $40,000 was released from the "reserve" account to pay some of Decker's creditors. For the purpose of maintaining the ratio of the debt to the value of the property given as security, a one-half interest in twenty-seven lots purchased by Decker from the other partners was given as security under the two subsequent deeds of trust. A one-half interest in twenty-seven lots, average value per lot being $3,000, would be worth about $40,500. The net effect of these transactions is that the value of the property released from the March 27, 1961, deed of trust was replaced by the equivalent value of the land conveyed under the two subsequent deeds of trust, while the amount of the antecedent debts remained relatively constant —$249,000 in March 1961, and $247,000 in November 1961.

While the above figures are admittedly approximations, they are sufficiently close as not to materially alter the legal effect. Although the form of the security changed, its value in relation to the amount of the debts did not. It follows that if the ratio of debt to value of secu-

rity was not disproportionate under the March 27, 1961, deed of trust, as we have held, a similar conclusion is required with regard to the two subsequent deeds of trust.

There remains for our review the finding of the referee that the two subsequent deeds of trust were given by Decker with actual intent to hinder, delay or defraud creditors within the meaning of § 67(d) (2) (d). The court is referred to nothing in the record to support this conclusion, and, indeed, a perusal of the entire record reveals no evidence of fraudulent intent on the part of Decker. The transcript of testimony does disclose that Decker used the deeds of trust to ward off creditors who threatened to file suit. Decker testified that on one occasion the March 27, 1961, deed of trust was shown to an Internal Revenue agent in order to discourage the filing of a tax lien. Also, the "reserve" account was used to appease those creditors who threatened to sue if they were not paid. However, these acts alone do not permit a finding of actual intent to hinder, delay or defraud creditors. "For it is well-settled law that a conveyance made in good faith, whether for an antecedent or a present consideration, is not forbidden \* \* \* notwithstanding the effect may be that it hinders or delays creditors by removing from their reach assets of the debtor." Coder v. Arts, 213 U.S. 223, 243, 29 S. Ct. 436, 444, 53 L.Ed. 772 (1909); See 4 Collier on Bankruptcy, para. 67.37, p. 534 (14th Ed. 1967). The testimony of Decker, Gilmer, and Adams is consistent throughout. The purpose of the March 27, 1961, deed of trust and the financial plan was to put Decker back on his feet and enable him to get out from under his debts. Nowhere does it appear that bankruptcy was contemplated at the time the deeds of trust were executed, and a finding of bad faith on the part of Decker or Gilmer is not justified in the record. See Dean v. Davis, 242 U.S.

---

3. Although Decker's testimony refers to 30 lot sales, the list of charges and deposits to the "reserve" account reveals that the proceeds of no more than 24 lot sales were deposited in that account.

**516**

438, 37 S.Ct. 130, 61 L.Ed. 419 (1916); Shay v. Gagne, 275 Mass. 386, 176 N.E. 200 (1931). While the intent of Decker to prefer Gilmer to his other creditors would be an important factor to consider in determining whether an intent to defraud also exists, an intent to prefer, without more—such as the violation of express provisions of a statute—is not a fraudulent intent. See Van Iderstine v. National Discount Company, 227 U.S. 575, 33 S.Ct. 343, 57 L.Ed. 652 (1913). The law of Virginia does not differ on this point. Temple v. Jones, Son & Co., 179 Va. 286, 19 S.E.2d 57 (1942); see 9 Michie's Jurisprudence, Fraudulent and Voluntary Conveyances § 41 (1950). Decker's preferences violated no provision of the Bankruptcy Act, and hence he could rightfully wave the deed in the face of his creditors to keep them at bay.

What we have said as to the bankrupt's intent also disposes of the question of whether Gilmer or the bank acted in good faith in taking the benefit of the deeds of trust. Good faith cannot be said to be lacking unless the transferee knowingly participated in the debtor-transferor's purpose to defeat other creditors or lacked good faith in valuing the property exchanged. Gilmer v. Woodson, supra, 332 F.2d at 541. We find no evidence that Gilmer lacked good faith in valuing the property. Hence the element of fair consideration for the two subsequent deeds of trust was not lacking.

Accordingly, it is the opinion and judgment of this court that the findings of fact and conclusions of law embodied in the referee's order of September 11, 1968, to the extent not modified by this opinion, are hereby adopted and affirmed; the order of August 23, 1968, is hereby reversed. It is our opinion that the March 27, 1961, deed of trust, and the two supplemental deeds of trust are valid.

The clerk of this court is directed to send copies of this opinion and judgment to counsel of record and to the referee.