**In the Matter of William DAVENPORT, Debtor.**

**Lawrence KLEINFELD, Trustee, Plaintiff,**

v.

**UNIVERSITY STATE BANK, Defendant.**

Bankruptcy No. 82–658.
Adv. No. 83–816.

United States Bankruptcy Court, M.D. Florida, Tampa Division.

Sept. 1, 1986.

**412**

Francis H. Cobb, Tampa, Fla., for plaintiff.

William K. Zewadski, St. Petersburg, Fla., for defendant.

John M. McCormick, Orlando, Fla., for Barnett Mortgage Co.

Nixon & Nixon, Tampa, Fla., for University State Bank.

### FINDINGS OF FACT, CONCLUSIONS OF LAW AND MEMORANDUM OPINION

ALEXANDER L. PASKAY, Chief Judge.

THIS IS a Chapter 7 liquidation case and the matter under consideration is an attack by Lawrence Kleinfeld (Trustee) on three real estate mortgages executed by William Davenport (Debtor) which granted to the University State Bank (Bank) mortgages on the residence of the Debtor and two condominium apartments, one located in Redington Beach and the other located in Pensacola, Florida. The attack of the Trustee is based on the contention that the execution of these mortgages constituted transfers within the meaning of the Bankruptcy Code and they are voidable by virtue of § 547 as preferential transfers, or, in the alternative, they are voidable because they are fraudulent transfers within the meaning of that term as set forth in § 548 of the Bankruptcy Code.

The precise question of the preference claim is based on the contention that these mortgages were executed by the Debtor while he was an "insider" of the Bank within the meaning of the term as defined by the Bankruptcy Code in § 101(28); that the mortgages were executed to secure an antecedent obligation; they were executed by the Debtor while he was insolvent; and if the Bank is permitted to retain these interests acquired by the mortgages, it would receive more than it would receive if the case was a case under Chapter 7.

The fraudulent transfer claim asserted by the Trustee is based on the contention that (1) the Debtor executed these mortgages with the specific intent to hinder, delay, or defraud creditors, or (2) that these transfers were without fair and adequate consideration while the Debtor was insol vent and, therefore, they fall within the prohibitive provisions of § 548 which en-

ables the trustee of the estate to set aside such transfers.

The facts relevant to the resolution of this controversy, as established at the final evidentiary hearing, can be summarized as follows:

Prior to 1980, the Debtor was the Chief Operating Officer and the person in control of several entities basically engaged in selling gasoline and allied products in several states including the State of Florida. These operations were conducted by a corporation known as Key Energy Enterprises, Inc. which was a holding company of Key Energy, Inc. and some other entities which operated numerous gasoline service stations throughout the State of Florida.

Sometime prior to 1980, the Debtor became acquainted with principals of the Bank, Mr. J.L. Richards and Mr. Churchill. Soon thereafter the Debtor acquired stock in the Bank, representing 20% of the total outstanding shares of the Bank, and became a member of the board of directors. He was also appointed Vice President in charge of development.

It further appears from the record that sometime in mid–1980, Mr. Churchill suggested to the Debtor the possibility that the Debtor might borrow monies from the Bank in order to utilize the same in several of the Key Energy operations. Initially, the loan was proposed in the amount of $250,000, but because of the then existing limitations on the interest rate which the Bank was permitted to charge by the usuary laws of this State, the loan was ultimately approved and granted in the amount of $500,000. The note signed by the Debtor was secured only by 100,000 common shares in Key Energy Enterprises, Inc. It is not clear whether the stock pledged was openly traded over the counter or what the going price of the stock was. Be that as it may, there is no question and it is without dispute that the value of this stock steadily declined from then on.

It further appears that at the time relevant to this controversy, Key Energy did its banking with Metropolitan Bank (Metropolitan) a bank which is now defunct and which at this time is in the process of liquidation by the FDIC. At one point in time there appeared to be an overdraft in the payroll account of Key Energy Enterprises, Inc. maintained at Metropolitan. For this reason Metropolitan requested additional collateral from collateral from the Debtor unless Key Energy could rectify the situation and pay the shortgage on the payroll account which was in the approximate amount of some $16,000.

This event turned out to be a hotly disputed and crucial point in the transaction between the Debtor and the Bank. This is so because it is unclear whether or not Mr. Churchill suggested or the Debtor requested the transactions which are the focal point of the entire controversy, that is, the execution of the three mortgages. According to Mr. Churchill, Metropolitan requested additional collateral, but in order to prevent Metropolitan from obtaining an interest in the properties owned by the Debtor, the Debtor did execute the three mortgages in question. However, on close examination this appears to be the secondary motivation of the Debtor and he executed these mortgages primarily because the Bank felt seriously undersecured due to the fact that the Key Energy stock drastically declined in value. According to the Bank, the stock could not have been dumped on the market and received more than 10¢ per share at that time. It is without dispute that at the time these mortgages were executed, the Debtor received no additional consideration whatsoever.

In addition, the validity and enforceability of these mortgages, while originally not challenged by the Trustee, are now in dispute. This is so because the Trustee established that these mortgages were not executed in conformity with the requirements of the laws of the State of Florida and therefore the mortgages would not be enforceable against a bona fide purchaser for value, which in turn would enable the Trustee to defeat these mortgages by virtue of § 544(a)(3). As noted, this was not an issue raised by the original pleadings,

but at the conclusion of the presentation of the case, the Trustee moved to amend the pleadings to conform to the evidence, and the motion was granted. The issue is now properly before the Court for consideration.

■ As noted earlier, it is the Trustee's contention that at the time these mortgages were executed, the Debtor was an insider and this, of course, is necessary because these transactions admittedly occurred outside of the 90 day time frame fixed by § 547(b)(4)(A), but within 1 year from the commencement of the case and at a time when the Debtor was insolvent, which is the preference period for insider transactions fixed by § 547(b)(4)(B). There is no question that the mortgages in question were executed to secure an antecedent obligation of the Debtor, and thus, as such, could be avoided as a preference provided the record supports the conclusion that the Debtor was, in fact, an insider at the time he executed these mortgages. In addition, as noted earlier, based on these facts, it is contended by the Trustee that the mortgages were executed by the Debtor to frustrate and hinder Metropolitan or, in the alternative, the Debtor did not receive fair and adequate consideration for the execution of the mortgages. Concerning this last contention urged by the Trustee, this Court is satisfied that there is no doubt that the Debtor was indebted to Metropolitan at the time he signed these mortgages, and this pre-existing obligation could serve as adequate and fair consideration under the applicable law (provided that the amount of the obligation and the value received are not disproportionate). *See In re Decker,* 295 F.Supp. 501 (W.D.Va.1969), *aff'd* 420 F.2d 378 (4th Cir.1970). Therefore, this contention of the trustee is without merit and shall not be considered further.

■ This leaves for consideration the preference claim of the Trustee and the claim of fraudulent transfer based on the alleged specific intent by the Debtor to hinder, delay or defraud a creditor by executing the mortgages. The issue of the Debtor's position as an insider is raised by the Bank who contends that at the time these mortgages were executed, the Debtor was no longer an insider. This contention is based on the proposition that it is without dispute that the Debtor did, in fact, resign as a member of the board of directors on October 20, 1981, some weeks before the execution of the mortgages. It is equally clear, however, that the agreement to execute these mortgages was made by the Debtor weeks before he resigned from the Board. However, there is nothing in this record to establish that he ever resigned as Vice President in Charge of Development until the following year in February. Thus, technically, at the time these mortgages were executed in October and November, the Debtor was still an officer, thus an insider.

The Bank contends, however, that the Debtor was solvent at the time these mortgages were executed and, therefore, these transactions cannot be avoided as preferences. This contention is based on a financial statement on record prepared by the Debtor dated June 30, 1981, which indicates a net worth of $7,838,116. A close analysis of the financial statement indicates, however, that among the assets scheduled by the Debtor are his residence valued at $225,000 and his investment in Key Energy Enterprises comprised of 1,702,215 shares valued at $8,035,521. This valuation was based on $1.00 face value and $4.75 market value of the stock.

■ As noted earlier, according to the Bank, the shares were not worth more than 10¢ per share. If one readjusts this number and accepts that value, this asset must be reduced by $270,221.50. In addition, if one makes an adjustment for this and removes from the asset column the condominium residence of the Debtor which is claimed as homestead, thus exempt from the claim of creditors, the $7,838.116 net worth shown on the statement would turn out to be not a positive but a negative net worth. This would, of course, clearly indicate an insolvency status of the Debtor at the time these mortgages were executed.

■ The contention of the Bank that the Bank had no reason to believe that the Debtor was insolvent must also be rejected. On this record it is crystal clear that the very reason the Bank requested additional security is because of the drastic loss in the value of its collateral due to the speedy and steady decline of the value of the Key Energy stock. This being the case, it ill behooves the Bank to contend now that they were ignorant and did not have any idea the Debtor was insolvent. Moreover, the Bank was very well aware that one of the mortgages it was receiving encumbered the homestead property of the Debtor and, therefore, under the applicable law of this State, it was not a proper item to be included in the asset column when one considers the solvency, vel non, of a debtor.

■ This leaves for consideration the last contention advanced by the Trustee that the execution of these mortgages was made with the specific intent to defraud, delay or hinder a creditor, specifically Metropolitan. The evidence at this point is clear that one of the reasons for the execution of these mortgages was to prevent Metropolitan from obtaining collateral for the overdraft. The only additional collateral available at that time were the three real estate holdings of the Debtor. This being the case, the inference is not unwarranted that these mortgages were executed by the Debtor in order to hinder the efforts of Metropolitan to obtain additional collateral to shore up its position. Based on this, this Court is satisfied that the evidence presented is sufficient to conclude that the execution of these mortgages were fraudulent transfers within the meaning of § 548(a) executed by an insolvent debtor with the specific intent to hinder, delay and defraud Metropolitan. From all this it follows that the Trustee is entitled to invalidate all three mortgages on the voidable preference ground, or on the alternative ground of fraudulent transfer.

A separate final judgment will be entered in accordance with the foregoing.